### In re ANDERSON.

No. 26248.

United States District Court
E. D. Wisconsin.
April 17, 1952.

Vaudreuil & Vaudreuil and Leo E. Vaudreuil, Kenosha, Wis., for bankrupt.

V. J. Lucareli, Kenosha, Wis., for Local Loan Co. and First Credit Co.

Ralph K. Rosenbaum, Milwaukee, Wis., for Commercial Credit Plan, Inc.

TEHAN, District Judge.

This matter is before the court on a petition for review of that part of a certain order dated March 18, 1949, made by Carl R. Becker, Referee in Bankruptcy, wherein said Referee sustained the specifications of objections of two unsecured creditors, Local Loan Company of Kenosha and First Credit Company of Racine, both so-called "small loan" companies, and denied the petition for discharge of the bankrupt.

On June 7, 1948, John Henry Anderson filed a petition in bankruptcy and was adjudicated a bankrupt. His petition listed nine creditors, five of them small loan companies having claims in the total sum of $1,057.60, two doctors, listed as creditors in the sum of $130, two furniture stores, in the sum of $262.50; in all, a total indebtedness of $1,450.10. His only assets listed were household goods, furniture and wearing apparel valued at $300 and claimed as exempt under section 272.18(5), Wisconsin Statutes. The referee by order dated December 13, 1948 fixed January 13, 1949 as the last day for filing objections to the discharge of the bankrupt, and notice there-

of was duly given to the creditors. On January 10, 1949, the Local Loan Company filed specifications of objections to the discharge of the bankrupt alleging that on September 22, 1947 the bankrupt obtained a loan in the sum of $300 by means of a materially false statement in writing, which statement, in substance, recited that at such time he, the bankrupt, was indebted to the First Credit Company, Racine, in the sum of $90, the Household Finance Company, Racine, in the sum of $160, and Dr. R. M. Kurten of Racine, Wisconsin, in the sum of $18, and that he had no other debts. The objecting creditor, Local Loan Company, averred that in addition to the above, the bankrupt was at that time, and unknown to them, indebted to the Junction Furniture Company of Racine, in the sum of $330, the Porter Furniture Company of Racine in the sum of $68, the Federal Discount Corporation, Racine, in the sum of $270.32, the Commercial Credit Plan, Inc., Milwaukee, $206.50, Nash-Kelvinator Credit Union, Kenosha, Wisconsin, $130, and Dr. H. F. Brehm, Racine, $95.

On the same day, January 10, 1949, the First Credit Company filed specifications of objections to discharge of the bankrupt, relating, in substance, that on the 20th day of December 1947, the petitioning bankrupt had obtained a loan in the sum of $220 by means of a materially false statement in writing wherein the bankrupt represented that he was indebted and under obligation to no one except H. H. Bahl, dentist, $60, and Household Finance Company, $95, whereas, the objecting creditor alleges, in truth and fact, the bankrupt was at such time indebted to ten other creditors in an amount of $1,775.02.

A hearing on the matter was held in the city of Racine on the 10th day of February, 1949. The specifications of objections in behalf of a third objecting creditor, the Commercial Credit Corporation, were also heard at such time, but while the referee found that a materially false statement had been made by the bankrupt to it, he found that such objecting creditor had placed no reliance on it. From such decision the said objecting creditor has not asked for a review and, therefore, no fur-

ther reference herein will be made to it. After the hearing, the referee rendered an opinion and made findings of fact and conclusions of law which are substantially as follows:

First, as to the Local Loan Company, the referee found that the bankrupt did execute a statement in writing on September 22, 1947 wherein he disclosed the following creditors:

| | |
|---|---|
| First Credit Company of Racine | $ 90.00 |
| Household Finance Company of Racine | $160.00 |
| Dr. R. M. Kurten of Racine | $ 18.00 |

That the bankrupt further represented that he had no other liabilities or indebtedness of any kind, and that the statement was in his handwriting, signed in the presence of a representative of the company; that said statement was false in that it failed to disclose the obligation of the bankrupt to Porter Furniture Company, $68, Dr. H. R. Brehm, $92, Junction Furniture Company, $194.50, and Commercial Credit Plan, Inc., $206.50; that said written statement was given to Local Loan for the purpose of inducing said company to loan him $300; that said statement was materially false, and that it was relied upon by Local Loan in making said loan.

As to the objecting creditor, First Credit Company, the referee found that the bankrupt executed a written statement in his own handwriting and over his signature wherein he represented that his only creditors then existing were,

| | |
|---|---|
| F. H. Bahl | $60.00 |
| Household Finance Company, Racine | $95.00; |

that said written statement contained in the bankrupt's handwriting, "I have no other bills"; that said statement was false in that the bankrupt was then obligated to Commercial Credit Plan, $206.50, Local Loan, $286, Dr. Brehm, $90, and Junction Furniture Company, $194.50; that said statement was given to First Credit Company for the purpose of inducing said company to loan him the sum of $220; that said statement was materially false, and that it was relied upon by First Credit Company in making said loan.

The referee, as and for a conclusion of law, found that the discharge of the bankrupt must be denied.

Under date of March 24, 1949 the bankrupt, John Henry Anderson, petitioned this court for a review of the order of the referee denying the discharge of the bankrupt, alleging, in substance, that the bankrupt fully disclosed to the Local Loan Company all of his indebtedness on September 22, 1947; that while the written statement, which is in evidence, enumerating his creditors contains only the aforesaid three main ones, he had been advised by an employee of the Local Loan Company that it was not necessary for him to list any more creditors, and that the statement was merely a matter of form and had no other effect; that he was urged to write the statement, "I have no other bills", although he advised said employee that he did have other debts and that he would have listed all of his debts had he not been so advised. He further alleged that the referee was in error in finding the bankrupt misrepresented his financial condition or that he made the statement for the purpose of defrauding the company, or that the Local Loan Company was misled by said statement.

As to the First Credit Company the bankrupt in his petition for review alleged substantially the same reasons as above.

The statute which is here involved, Title 11 U.S.C.A. § 32, sub. c(3) provides:

"The court shall grant the discharge unless satisfied that the bankrupt has * * * obtained an extension or renewal of credit, by making * * * a materially false statement in writing respecting his financial condition".

■ It is well established that in order for a discharge to be denied, the creditor from whom the credit was obtained must have relied on the false statement in granting the credit. Crue v. Timmer, 6 Cir.1941, 119 F.2d 415; In re Jaffe, 2 Cir., 20 F.2d 370; Bank of Monroe v. Gleeson, 8 Cir., 9 F.2d 520; Rauch v. Manchester-Smith Co., Inc., 4 Cir., 240 F. 687.

After a preliminary study of the record this court ordered the matter set down for further testimony and argument on the question of what reliance, if any, the objecting creditors had placed on the financial statements made by the bankrupt. At the time of the hearing the scope was broadened so that an entire hearing de novo was had in the above premises.

Three witnesses testified at the hearing: The bankrupt, Anderson, in his own behalf, and the local managers of each of the objecting creditors.

Anderson, by his demeanor on the witness stand and his forthright manner of answering impressed us as an honest and reliable witness. His testimony presents the story of an ordinary factory worker beset by uncommon misfortune—long and aggravated unemployment, severe and costly family illness and a ten-year long struggle to free himself and his family from the resultant burden of debt.

It appears that back in 1938 Anderson was employed at the Nash Motor Company plant in Racine, Wisconsin. He was then about thirty-six years of age, married and had one child. His schooling consisted of the usual eighth grade education. He had had eleven years of service with that company when, on January 1, 1938, the Nash Plant shut down and he was not recalled to work until September 1938 when the plant reopened in nearby Kenosha. When he finally got back to work he was over $600 in debt for matters like rent, groceries, clothing, coal and medical bills. When these creditors all wanted their money at once and some threatened to garnishee his pay, he went for the first time to a loan company and borrowed money. From that day forward there was not a time when he was not indebted to several loan companies. In addition to his debts, arising from the unemployment in 1938, his wife subsequently became quite ill and the medical expenses increased his debts by an additional $1,500.

It was not until December 1945 that he made his first loan at the Local Loan Company in the amount of $100, but subsequent loans followed closely after. Late in January 1946, he applied for a $150 loan, netting $60 cash after paying the balance of the first. Then some ten months later, in November, a new loan was made which

gave him only $18 cash after the balance of the former note was deducted. In the following month, December, the fourth loan was arranged in the sum of $300, of which $155 was applied on the preceding note and the balance of $145 given in cash. Two months later, in February 1947, another loan of $300 was made but there is an absence of evidence as to the net cash received by him. Finally, in September 1947, the last loan, and the one we are here concerned with, was made in the sum of $300. As a result of this loan there was available to him in cash only $48.92.

Anderson stated that the practice employed by the objecting Local Loan Company in the matter of financial statements was always the same. The Local Loan official knew of and discussed his various debts, particularly those of other finance companies and how he was going to handle the loan applied for. After the loan was made, he states, before you leave you sign about four papers, one of which is the financial statement. Then you are asked to write down the bills you owe others but after you have written down the names of some of these creditors, the loan official would say, "Write down below there, 'I have no other bills', and sign it." Such method was followed even where the interview itself has shown knowledge of other debts by the company or disclosed by the applicant. When he started to write other creditors' names down, the loan official would say, "It is not necessary to write them all." It was his testimony that this was the procedure followed in making the Local Loan Co. loan in September 1947, which transaction was the basis of the objection before us. He told the agent he owed a lot of money. He further stated that the Local Loan official himself told him at that time that he owed in addition to Local Loan, loans to Household Finance, First Credit and "some Milwaukee outfit" by the name of Northwestern Acceptance Company. Anderson denied owing the latter debt, claiming payment thereof. Upon being told the matter still appeared on his credit rating and the showing of a receipt would be required, he made a special trip to the Local Loan office to show it.

Anderson's relationship with the other objecting creditor, First Credit Company, began in 1940 and continued until December 1947 when the loan here under consideration was made. During those eight years there were eleven loan transactions. The great majority involved the application of a substantial portion of the new loan to the retirement of the prior loan. There were only two occasions when he was not in debt to that company during that time, once for a period of about six weeks in early 1945, and the second time, a period of above five months early in 1946.

The manner of obtaining the financial statement on the First Credit Company loan of December 1947 followed the usual procedure with the exception that he stated the date inserted was not in his handwriting and he had no recollection of signing the statement on that particular day. He recalled vaguely that the girl asked him if it would be all right if he signed the note and she would mail the canceled note, passbook and other papers to him.

Anderson at the time of the hearing had been in the employ of one employer, the Nash Motors Company, for the past twenty-two years. He stated he was not a drinking man—had never had a drink in his life. He testified that he would have worked these debts out if he had been left alone, but the Local Loan garnished his wages and two others threatened to, so it was necessary for him to go into bankruptcy.

Anderson's testimony was contradicted by the two witnesses for the objecting creditors. These office managers testified on behalf of their respective companies, their testimony being substantially similar, to the effect that each had had no oral conversation with the bankrupt concerning his debts other than to tell him to list all of his creditors as of the date of the statement. Each then directed the applicant to write in, in his own handwriting, the same identical words, "I have no other bills." Each stated he had first discovered the bankrupt was indebted to persons not listed on the statement when he received notice of the bankruptcy. Each maintained he had relied entirely on the bankrupt's financial con-

dition as indicated by the statement, and had not made independent investigation outside of the statement to determine the financial condition of the bankrupt.

Both loan companies, coincidently, use a form of financial statement that is almost identical in appearance and wording. It consists of a paper about 8½ inches wide by 7 inches long. After providing blank spaces for the insertion of his salary and other income, the form carries the following language bearing on his financial status:

"The only persons or companies to whom I owe money and their names and the amounts of each indebtedness are as follows:

"I am not a signer, co-maker, surety, indorser, or guarantor on any notes or other contracts, except the following:

"I have no other liabilities, or other indebtedness of any kind whatsoever, or claims against me, in dispute or otherwise, except as follows:"

Following each of these three statements is a blank white space not exceeding one inch between paragraphs wherein the applicant may, in his own handwriting, list the names of creditors and the amounts of the obligations.

This court inquired whether either company tried to assist an applicant to refresh his memory of his debts, either orally or by means of a list suggestive of the many items of ordinary going expenses, such as food stuffs, insurance, union dues, medical bills, furniture bills and the like, and was informed no such practice was used.

Both witnesses admitted that a financial statement of the character of the one herein would be of some value if it was not completely accurate in that it could be used in a bankruptcy proceeding to bar discharge. Both said they had used such financial statements as a basis of interposing objection to discharge prior to this.

This court believes the fact to be that the objecting creditors did not place any reliance upon these form financial statements. Much of the testimony of the two loan office officials appears improbable and, in fact, many of their statements are completely incredible. This court observed the demeanor of the witnesses very closely during the course of the testimony, and the evasiveness and lack of candor of the two loan office managers was very marked.

The financial condition of the bankrupt was obviously worsening over the years. In each instance his debt had steadily increased since it was first incurred. On one occasion when renewing a loan, less than a year before the loan in question, the bankrupt borrowed the small additional sum of $18 in cash to take care of "household needs due to being laid off job." Yet the Local Loan manager testified that this was no indication to him that the bankrupt's financial condition was getting worse rather than better. Later on, when questioned more closely concerning the implication of the steadily increasing debt, the witness became more evasive. He further testified that he had made no inquiries of the bankrupt during all of the eight years that he had been doing business with him as to whether or not he had any sickness in the family or any extraordinary expenses during that time, nor did he make any attempt whatsoever to find out why his debt to Local Loan was increasing as time went by.

On the statement given to Local Loan, the bankrupt had listed two other small loan companies as his creditors and an $18 doctor bill. It seems incredible to us that the manager of the Local Loan office in Kenosha, who testified that he had twenty-three years of experience in that type of business, would believe that this man who said he was indebted to three small loan agencies and sought a renewal of his loan had only one other creditor in the amount of $18. We likewise find incredible the manager's statement that without further knowledge or inquiry, he relied on this statement in granting further credit. He testified that although his office collaborated with other small loan offices, including those in Racine, in exchanging information, and although the Credit Bureau of the Chamber of Commerce was available to him, he never made an independent investigation outside of the statements in question. Later on he revised his testimony and stated

that he did go so far as to call the two other small loan companies in Kenosha and that the bankrupt had no loans there. Other testimony by him disclosed that his practice was not to check in Racine unless the party states that he has a loan in Racine, and that inquiries are more careful when the borrower indicates he is indebted to another small loan outfit. All three of the debts listed on the Local Loan statement were located in Racine.

The situation with regard to First Credit Co., which is located in Racine, was similar. There the manager testified to sixteen years of experience in the small loan business. The financial statement listed one other small loan company and a $60 dentist bill.

The manager denied that there was any clearing house or cooperative effort on the part of small loan companies in the area, but did say that they phoned loan companies, dry goods stores and banks to check, that they preferred not having duplication of debts as to small loan companies, and that he would have received the information had he phoned. He also admitted that on occasion he exchanged information with the Local Loan Co. in Kenosha, but denied that he had made any inquiry of Local Loan or any other loan company in this particular case. He further testified that the Credit Bureau of the Chamber of Commerce was available to him, that at the time of the original loan in 1940 they did make inquiries of the Chamber of Commerce, and that so far as he knew there was no better credit service available, but that subsequent to the original loan, except for the information provided by Anderson, no further inquiry was made for the following seven years, and that the only person asked as of the December date was the bankrupt himself.

The manager of the First Credit admitted that very often persons borrowed from small loan companies in order to consolidate a number of debts and get them all in one place, and that his company had used this approach in its advertising.

The manager also admitted that First Credit had made attempts in previous cases to get their money after a bankruptcy

was filed, but claimed they had only opposed discharge in one or two cases. He stated that it is not necessarily their policy to withhold filing objections if a promise of repayment is made, but admitted that at times he had refrained from filing objections by reason of promises. He further admitted that the thought had occurred to him that a financial statement of this character would be of some value in barring discharge in bankruptcy if it was not completely accurate and admitted that it had been discussed with him and the members of his office. Accused by questions of bankrupt's attorney of soliciting said attorney to make a promise of repayment, he admitted that he had called the attorney once, that the attorney called back and that the witness had called back the attorney. The witness was then advised that it was a criminal violation for a creditor for a consideration to act or forebear to do an act for the purpose of obtaining advantage in a bankruptcy proceeding and that he could refuse to answer any questions when such answers would tend to incriminate him of such violation. The witness then indicated that he wanted to avail himself of the constitutional right against self-incrimination and refused to answer any further questions along this line.

■ ■ It is my conclusion after hearing the testimony and studying the exhibits received in evidence in this hearing de novo that (1) the bankrupt, John Anderson, while he executed financial statements which admittedly did not disclose his entire condition of indebtedness, *did not make a materially false statement in writing respecting his financial condition,* and that (2) neither of the objecting creditors relied on the financial statements that were executed by the bankrupt.

I have indicated before that I was favorably impressed by the bankrupt Anderson. His demeanor on the stand and his testimony was that of an honest, steady workingman, who had had little or no business or commercial experiences and only a modest amount of formal education. I believe his story that he told these loan officials that he had a lot of debts, that they each had knowledge of and discussed his

debts, and that they discouraged his writing in additional names of creditors on the statements, indicating to him it was a mere formality. It follows that I do not believe that the financial statements were false in the sense of being knowingly and intentionally untrue. Gilpin v. Merchants' Nat. Bank, 3 Cir., 165 F. 607, 20 L.R.A.,N.S., 1023.

On the question of reliance, I unhesitatingly find that neither objecting creditor placed any reliance whatever on the financial statements. Granted that there is in the record the flat assertions by the loan company officials that they did so rely, yet so evasively and uneasily did they testify and deport themselves, that I rejected their oral assertions as untrustworthy and improbable.

I, therefore, find that the bankrupt Anderson is entitled to his discharge. His attorney will prepare findings of fact and conclusions of law in accordance with this opinion and submit them to this court.

What I have set down to this point disposes of the matter before the court. But because I believe it might be of use and complete the whole picture I will now discuss the implication which is clear from the foregoing findings—that is, that the agents of the objecting creditors deliberately contrived to obtain a financial statement that would be incomplete and erroneous for the purpose of using it to prevent the extinguishment of their claim by a discharge in bankruptcy.

The effect of Section 32, sub. c(3), Title 11, U.S.C.A., on the ordinary business of objecting creditors is such a possible factor and has been so much used and litigated that it is inconceivable that the possible use it might be put to was unknown to objecting creditors. In fact, the testimony is clear that its use was known and had been discussed at the office. Both witnesses admitted its use to block discharge, both admitted having used it to get settlements or renewals of claims and it appears that such efforts were made in this case by one of the parties.

The procedures employed by both objecting creditors in this case, as related by these witnesses, fall far short of conduct which would impress us as that of a person who was going to obtain information on which he would be able to place reliance.

The oral and written disclosures showed existing obligations to another finance company. One witness admitted such disclosure should put a person on inquiry; the other, evasively, and, I might add, unconvincingly, maintained such condition was not unusual and did not believe it called for any investigation. The fact is that neither did resort to sources of information easily available. The belated claim of one manager that he made a few inquiries must be rejected on the basis that had he done so, he would have easily discovered the facts. Such lack of ordinary alertness must also be set in the background of Anderson's obviously worsening financial condition.

The record in this case, of course, contains no evidence on the small loans business and we are hesitant to go far afield in the realm of judicial notice. We do know, however, that they do charge a higher legal rate of interest than other facilities available to people having property and credit rating. And, we do know and the record substantiates the advertising appeal made by the various loan companies to debtors to consolidate their debts by borrowing enough from the loan companies to retire the various debts and then to repay only the one creditor. There is unmistakably the implied recognition that their potential customers are beset with many and numerous creditors.

The almost identical forms for financial statement appear to us to be singularly unadaptable for the listing of the numerous creditors, the more so in the light of the admonition that the applicant is directed to fill them in in his own handwriting. A sparse one-inch space is provided. The two exhibits in evidence show that one is comfortably filled by the three insertions made; the other, substantially so by the two creditors listed. As stated before, nowhere is any assistance given the applicant to refresh his recollection. The procedure and facilities do nothing to bolster objecting creditors' claims that this was a

statement on which they wanted to and did rely.

There was a type of reliance in this case, of course,—but not on the financial statements as claimed. It is my conclusion from all of the evidence that the agents of the objecting creditors knew that Anderson was a sober, industrious workingman who had worked steadily for one employer. for over twenty years; they knew, too, that he had shown no disposition to rebellion but had plodded along paying and refinancing, and also, they knew they had financial statements which were incomplete and erroneous which would be useful to them in the event he would attempt to obtain relief in the bankruptcy court. These—not the financial statements—were the things upon which the objecting creditors relied.