Ebb SWINT, Bankrupt, Appellant,

v.

ROBINS FEDERAL CREDIT UNION
and Fred H. Hodges, Trus-
tee, Appellees.

No. 25756.

United States Court of Appeals
Fifth Circuit.

Aug. 15, 1969.

Marvin T. Morrow, Warner Robins, Ga., for appellant.

George E. Saliba, Macon, Ga., for Robins Federal Credit Union, appellee.

Fred H. Hodges, Macon, Ga., trustee-appellee.

Before JOHN R. BROWN, Chief Judge, BELL, Circuit Judge and HOOPER, District Judge.

JOHN R. BROWN, Chief Judge:

Law—and especially bankruptcy law—so often engrossed in technicalities, finds itself here being able to follow the general guide of human affairs in testing the legalistic standard of clearly erroneous, F.R.Civ.P. 52(a). The guide is that actions speak louder than words. Judge by what was done, not by what is said—particularly what is said about what was done and why. The springboard for such philosophic judgments is this appeal from the denial of a discharge in bankruptcy by the Referee (affirmed by the District Court). Robins Federal Credit Union and the Trustee in Bankruptcy object to the discharge on the basis of § 14c(3) of the Bankruptcy Act (11 U.S.C.A. § 32(c) (3))—making a materially false statement to obtain credit for a business.[1]

1. § 14b provides for the bankruptcy court to fix the time for filing objections to discharge after which "[T]he court shall hear such proofs and pleas as may be made in opposition to the discharge, by [i] the trustee, [ii] creditors, [iii] the United States Attorney * * * at such time as will give the bankrupt and the objecting parties a reasonable opportunity to be fully heard."

§ 14c provides:

"The court shall grant the discharge unless satisfied that the bankrupt has * * * (3) while engaged in busi-

We reverse the Referee's and the District Court's denial of discharge on the basis of § 14c(3) and remand with directions to allow discharge.[2]

Philosophic conclusions are in order for the problem of denial of discharge poses the experience-borne conflict between (a) the law's demand for a high morality in full, truthful conduct by one seeking credit and (b) the experience-gained judgment that assertions by creditors that statements, based upon the debtor's failure to list every debt on forms which are at best misleading, induced the indebtedness was a source of flagrant abuse both in the methods of loan solicitation and in the pressures brought to bear to get preferred treatment from the bankrupt debtor outside the bankruptcy machinery. That these consequences were most conspicuous in the shady, coercive conduct of the small loan business which led to the inclusion of the business purpose test for § 14c and the congressional awareness of these abuses[3] does not insulate business loans

ness as a sole proprietor, partnership, or as an executive of a corporation, obtained for such business money or property on credit * * * by making or publishing * * * in any manner whatsoever a materially false statement in writing respecting his financial condition or the financial condition of such partnership or corporation * * * *Provided*, That if, upon the hearing * * * the objector shall show to the satisfaction of the court that there are reasonable grounds for believing that the bankrupt has committed any of the acts which * * * would prevent his discharge * * * then the burden of proving that he has not committed any of such acts shall be upon the bankrupt."
11 U.S.C.A. § 32.

2. On the alternative ground urged by the Trustee under 14c(2) of failure to keep books, no adequate proof was made.

3. In enacting the 1960 amendment to 14c (3) to restrict denial of a general discharge, as distinguished from denial of discharge as to particular debt under § 17a(2), 11 U.S.C.A. § 35, which had been approved both by the National Bankruptcy Conference and the Judicial Conference of the United States, 1 Collier on Bankruptcy 1376 (14th ed. 1968), these experiences and judgments were graphically summarized by Sen.Rep.No.1688, 86th Cong., 2d Sess. (1960), U.S.Cong. & Admin.News, p. 2955:
 "The committee believes that complete denial of a discharge is too severe a penalty in the case of the individual noncommercial bankrupt. It is also a penalty which experience has shown to be subject to abuse. An unscrupulous lender armed with a false financial statement has a powerful weapon with which to intimidate a debtor into entering into an agreement in which the creditor agrees not to oppose the discharge in return for the debtor's agreement to pay the debt in full after discharge. The creditor may also accomplish his purpose of preserving his debt by not opposing the discharge and then suing in a State court on the ground that the debt is not dischargeable. Testimony before the Subcommittee on Bankruptcy and Reorganization by experts in bankruptcy law indicates that unscrupulous lenders have frequently condoned, or even encouraged, the issuance of statements omitting debts with the deliberate intention of obtaining a false agreement for use in the event that the borrower subsequently goes into bankruptcy.
 Even where the creditor has had no part in the issuance of a false financial statement, the exercise of his right to bar the discharge completely results in a windfall for other creditors who were not even aware of such a statement. Debts which are dischargeable are not discharged solely because one of many debts was induced by a false financial statement. This result is not required to protect a creditor who has relied on a false financial statement since under section 17a(2) that particular debt is not dischargeable.
 In view of the protection which section 17a(2) gives to the creditor, and in view of the abuses which have grown out of section 14c(3), the committee believes that it is desirable to eliminate the false financial statement as a ground for the complete denial of a discharge insofar as the individual non-commercial bankrupt is concerned.
 The situation is somewhat different in the case of a business bankrupt. The businessman is more likely to be aware of the severe consequences to him of issuing a false financial statement. His

—particularly little business loans—from such pressures nor from necessity of courts being conscious that as many times as not the objector has no noble motive, just a natural desire to get all he can, and certainly more than a bankruptcy dividend would have generated.

These considerations are very important as we assay whether the Referee's —not the District Judge's—findings were clearly erroneous, Bazemore v. Stehling, 5 Cir., 1968, 396 F.2d 701, 702, which in turn brings into play the substantive test of being left with a firm conviction that the judgment below does not represent the truth and right of the case. See Union Oil Co. v. Tug "Mary Malloy", 5 Cir., 1969, 414 F.2d 669, A.M.C.; W.R.B. Corp. v. Geer, 5 Cir., 1963, 313 F.2d 750, cert. denied, 1964, 379 U.S. 841, 85 S.Ct. 78, 13 L.Ed.2d 47. The simple fact is that Robins, the sole objecting creditor, has no equity in its favor, but, to the contrary, everything points to direct financial loss or reward depending on whether the conclusory [4] testimony on which its claim stands or falls is accepted or rejected. As discussed in more detail later, the loan was to be secured by the Georgia equivalent of a chattel mortgage. Had it been properly recorded, Robins' claim would have been satisfied for, even under the bankruptcy forced sale, it brought within $50.00 of the $4900 balance. But Robins, through loan manager, Levins, failed to record it

properly and mistakenly assumed that the non-filing risk insurance would cover it.[5] When bankruptcy ensued the Trustee naturally claimed the mortgaged property, and this resulted in a compromise by which Robins paid $2,000 to the Trustee for the assets under an express agreement that Robins "will not share in any dividends of this estate." Having (a) first caused a loss to the debtor from a failure prudently to preserve (and hence marshal) its security and then (b) agreeing not to pursue the Bankrupt's estate, Robins gets the prospect of payment in full from its own derelictions.

But it does not end there. It is acknowledged expressly by Robins that although the loan application did not list the substantial indebtedness of bankrupt as a guarantor on a loan for $3,000 by Robins to a third person, Douglas, which contingent indebtedness would ordinarily have been discharged, the order denying discharge resurrects this claim in full for the balance of bankrupt's economic life.

Thus, by successfully urging denial of discharge, Robins recoups the $2,900 loss occasioned by its own neglect plus $3,000 on the Douglas note guaranty. With $5,-900 at stake it turns out that denial of discharge rests entirely on testimony from Robins' representatives, and the critical element is a post-event rationalization of what it would *not* have done. To cap it off, Robins is the only creditor likely to reap any financial benefit.[6]

ordinary business records enable him to produce a more accurate statement than a householder who may have a multitude of small debts and no records. Furthermore, the financial statement issued by a businessman is frequently for the purpose of establishing credit standing in the community. His creditors may never see the financial statement itself. On the other hand, the nonbusiness debtor normally issues his financial statement to a particular creditor as part of his application for credit or for a loan. That creditor already has the protection of nondischargeability under section 17."

4. The direct "facts" as to the debts, their disclosure, amounts, etc., are virtually

undisputed. The critical element is reliance, i. e., whether the loan would have been made had the bankrupt made a full disclosure. By its nature this is unavoidably selfserving and conclusory and would seldom be subject to the sanction against perjury.

5. In fact, the insurance covered only loans not exceeding $3,000, so this $5,000 loan was not covered.

6. All creditors filing claims were paid in full. Robins does suggest that 6 nonfiling creditors whose claims aggregate $779 now have the right to pursue the Bankrupt, as will his 3 co-makers on the Douglas guaranty.

It rounds out this prologue to emphasize that the successful claim of false representation rests upon a literal application of this statement in the loan application form: "I am indebted to the following creditors (List all debts such as doctor bills, installments, loans, etc., attach additional sheet if necessary.)" [7] Four debts were listed, but it is undisputed that five were not. Had it ended there, the case would be simple and denial of discharge would be affirmed because this was a business loan,[8] the omitted information was material, Robins was entitled to rely on the whole statement, and under the statutory burden of proof (see proviso note 1, *supra*) bankrupt had failed to demonstrate that the omissions were not caused by purpose to deceive.

But it does not end there precisely because Robins knew that the statement was incomplete and omitted substantial liabilities, and hence Robins did not rely [9] on the correctness of the form in evaluating the credit risk.

Ebb Swint, the debtor-bankrupt, is a man of little education but a capitalist of considerable energy. He works as a fire inspector at Robins Air Force Base, is employed on a part-time basis at the Robins Officer's Club, and, in the true tradition of the American entrepreneur, in his spare time he established what at one time was a going concern, an off-base laundromat. Experiencing difficulty in meeting the high ($300 per month) payments owed an Atlanta bank on the laundromat equipped, he attempted to save the business by refinancing the equipment through a loan from Robins Credit Union which consolidated $5000 of his debts and reduced his monthly payments from a total of $340 to $167.[10] This $5000 loan application forms the basis of the objection to discharge under consideration here.

■ Swint was no stranger to Robins. This was his seventh loan, and their evaluation of his credit performance was good. He was apparently on friendly terms with loan manager Levins. In making the loan, it was intended that Robins get the Georgia equivalent of a chattel mortgage.[11]

Out of a total indebtedness of approximately $25,000 the application form did not list two with an aggregate of $15,300.[12] It also omitted the debts to be refinanced by the loan (see note 10, *supra*).

---

7. This was a card-type form. Immediately below the quoted statement were 4 lines for listing debts with vertical column headings "Name of Company or Person," "Reason for Debt," "Original Amount," "Balance" and "Monthly Payment."

8. See In re Doyle, S.D.N.Y., 1967, 272 F. Supp. 35; In re Branch, E.D.Tenn., 1964, 242 F.Supp. 534, aff'd sub nom. Branch v. Mills & Lupton Supply Co., 6 Cir., 1965, 348 F.2d 991, cert. denied, 1966, 382 U.S. 997, 86 S.Ct. 584, 15 L.Ed.2d 484. We reject Bankrupt's contention that In re Simms, E.D.V.A., 1962, 202 F.Supp. 911, justifies a holding of non-business loan.

9. Section 14c(3) "should be confined to cases where the decision to give credit was induced by the false statement, which must have been, if not the moving cause behind the giving * * * of credit, a contributing cause, i. e.: The lender * * * must to an extent at least have relied upon it." 1 Collier on Bankruptcy 1388 (14th ed. 1968).

10. The proceeds were distributed as follows:
 First National Bank of Atlanta $4090
 Gold Tate Reynolds 276
 Robins Credit Union 633

11. We agree with Robins that "The fact that a loan is secured by collateral makes no difference if the false written statement was a contributing factor in inducing the loan." 1 Collier on Bankruptcy 1383 (4th ed. 1968), citing In re Savarese, 2 Cir., 1913, 209 F. 830; In re Slohm, W.D.N.Y., 1935, 10 F.Supp. 351; In re Wylly, E.D.N.Y., 1913, 210 F. 954. See In re Bernstein, 7 Cir., 1952, 197 F.2d 378; Banks v. Siegel, 4 Cir., 1950, 181 F.2d 309.

12. Mortgage debt on home $12,000
 Co-maker guaranty on
 Douglas note 3,300
 -------
 $15,300

Quite apart from whether all the debts to be refinanced by the loan (note 10, *supra*) were somehow listed by attachments to the loan form, these other two (note 12, *supra*) were clearly omitted. They are important, not because they bear on the "materiality" of the four omitted by Swint, but because their handling demonstrates that Robins did not, as the word testimony reflected, act on or rely on the incomplete application statement.

The loan application was filled out and signed by Swint on August 3, 1965. On August 4 it went to the loan committee (three persons, two of whom testified). The loan committee approval was indorsed on the form on August 4, but the credit was not extended nor was the money advanced until August 6, at which time Swint executed the note, the security instrument, and, most significant, an affidavit. Although Robins seeks to overcome the significance of this omission with the contention that the form impliedly reflected [13] these debts aggregating $15,300 (note 12, *supra*), they fail in that the amount of such indebtedness was not revealed in any way on the form or attachment. Neither of the two loan committee members testifying could identify this loan precisely or state whether or not he was informed of either one or both of these liabilities, the dollar extent of them or the monthly payments. Yet each acknowledged that the information was relevant and needed. Their testimony that in evaluating the loan they relied on the information revealed on the form was demonstrated to be factually unsupported. The record proved further that it was Levins' judgment and recommendations that really counted, including whatever comments he made with respect to the omitted liabilities known to him.

This is important as it casts Levins' role. If he knew of the two debts (note 12, *supra*), he knew also that the loan application statement did not reveal all debts as called for. He knew, too, that the committee could not be relying on Swint's itemization of his debts in judging credit. And if he told them orally of the debts, he would know that the committee was not relying on the form's disclosure. He would know, too, that if they were relying on the statement it was a mistake to do so and the information supplied by him as loan manager was incorrect.

Of course, he took the position that, in effect, he knew of these obligations since, with the form showing "buying" a home (note 13, *supra*) all would know a mortgage debt existed, and as to the Douglas co-maker liability the only thing omitted was the amount, which Robins could ascertain from its records.[14]

But crediting this fully it becomes only more certain that Levins was the repository of all of Robins' knowledge and that he was not in fact—as he later testified—relying on the accuracy of Swint's itemization of his debts. This was demonstrated beyond all question by his contemporaneous act of August 6 when the money was actually advanced.

Despite his awareness that the form did not reveal the two debts ($15,300, note 12, *supra*) and the outstanding loans by Robins aggregating $633 (note 10, *supra*), he exacted from Swint an affidavit in which Swint was required to, and did, swear categorically that the loan application, "statement and list of debts" owed by him at present "is a complete, true and correct list as to the name and address of each and all of his creditors, the mortgage or other form of security given, if any, with respect to each of said

---

13. These contentions were based on the form blank questions and their handwritten answers:
 "Real Estate Owned or Buying? *Buying*
 Market Value *$12000*
 \* \* \* \* \*

Are you a co-maker of any other obligation? (If yes, list name, amount and book #)
*Yes Ingram Douglas*"

14. Douglas by this time was in bankruptcy.

debts, and to the best of deponent's memory and belief, the amount owing to each of said creditors, respectively and that deponent has not omitted from said list any debt now owed by him, of any nature, character or description whether secured or unsecured."

On the Robins story, on the Levins story, even if credited 100%, this affidavit was patently false and known by Levins to be such. Not only was it palpably in factual error, it likewise misrepresented that the erroneous, incomplete, application statement, thereby incorporated by reference in the affidavit and known to be affirmatively false, was the basis on which credit was advanced.[15] And Robins' effort now to minimize this affidavit as some afterthought formality hardly squares with the fact that it was exacted on August 6 before a single cent was advanced and the signer was warned that falsifications exposed him not just to Georgia sanctions, but to Federal sanctions, both disciplinary and criminal,[16] as well.[17]

 Since § 14c(3) requires a false statement "in writing", the objection has to rest on the incompleteness of the form *and*—and the "and" is decisive—reliance on the form as an accurate, honest itemization of all debts. This record demonstrates that the lender knew the itemization to be inaccurate, and it compels the conclusion that there was not, as required,[18] reliance on the statement. On the contrary, when it exacted the affidavit on August 6 it only made matters worse. Robins induced a sworn statement that the earlier itemized list was complete when it knew it was not. The affidavit being knowingly false was a trap which afforded a perfect paper record on which to circumvent discharge if the debtor defaulted. The purpose of § 14c(3) and the policy behind it are not served by such self-dealing (see note 3, *supra*). And, as in *Bazemore, supra*, when "what they said was totally inconsistent with what [they] did," 396 F.2d 701, 703, the denial of discharge may not stand.[19]

Reversed and remanded.

15. The affidavit went on to state:
"Deponent further says and acknowledges that this affidavit is made and given by him in connection with and as part of an application by deponent to Robins Federal Credit Union for a loan of money and as a part of the consideration of said loan, and specifically and expressly to induce Robins Federal Credit Union to make said loan to deponent."

16. The affidavit concluded:
"I have read the foregoing affidavit, understand the contents thereof, and I fully understand and acknowledge that failure to list any debt that I owe or failure to comply with the terms of the affidavit constitutes a false and fraudulent representation and can subject me to administrative disciplinary action up to and including removal from federal employment at Robins Air Force Base, Georgia, as well as possible criminal action through the United States District Court for the Middle District of Georgia. I also specifically acknowledge receipt of a copy of this affidavit as evidence of my understanding of the contents hereof and acknowledge that I have signed and sworn to such affidavit."

17. As a matter of fact, Swint was indicted and tried, but was acquitted in Federal Court on the count of false representation.

18. See Greenfield State Bank v. Copeland, 9 Cir., 1964, 330 F.2d 767; Wylie v. Ward, 9 Cir., 1961, 292 F.2d 590; In re Anderson, E.D.Wis., 1952, 104 F.Supp. 599; 1 Collier Bankruptcy 1389 (14th ed. 1968).

19. On remand discharge is to be granted. As to the misstatement in the form concerning Swint's prior bankruptcy, there was no proof at all that this had any bearing on credit evaluation of this repetitive borrower whose record was good.