In the Matter of Glen McDOWELL (McDowell Implement Co.), Bankrupt.

No. 2430.

United States District Court, W. D. Michigan, N. D.

Oct. 27, 1971.

Edward H. Dembowski, Marquette, Mich., for bankrupt.

Foster, Lindemer, Swift & Collins, Lansing, Thomas R. Roberts, Lansing, of counsel, for John Deere Industrial Equipment Co. and John Deere Co. of Lansing.

## OPINION

FOX, District Judge.

This action comes before this court upon a bankrupt's petition for review of a referee's ruling denying petitioner a discharge under the provisions of Title 11 U.S.C. Section 32c(3), which is Section 14c(3) of the Bankruptcy Act.

The following facts appear substantially uncontradicted by the record or the findings of the referee. Petitioner, Glen McDowell, operated in business as a sole proprietor, under the name McDowell Implement Company, in the sale, purchase, rental and repair of agricultural and industrial farm equipment from November 1, 1953 to the time of his voluntary petition in bankruptcy, November 10, 1969. Throughout this period, Mr. McDowell worked under one or another dealership contract with John Deere Equipment Companies, the objectors herein. (The specific objectors here are the John Deere Industrial Equipment Company, of Moline, Illinois and the John Deere Company of Lansing, Inc. These parties and their affiliates, manufacturers of goods sold by the bankrupt, have been and will be here referred to simply as "John Deere.")

As a part of the business relationship between John Deere and the bankrupt, John Deere would ship goods and equipment to McDowell upon order by McDowell, retaining a security interest in these goods pending retail sale by McDowell, the dealer. John Deere would customarily then finance the retail sale. In the event of outside financing or other full cash purchase, the dealer was held responsible to John Deere for the wholesale price of the equipment sold.

The cash flow of this operation was monitored by agents of John Deere called the territory managers. These individuals would make monthly checks of the dealer's inventory and prepare monthly statements to be signed by the dealer and reviewed and processed by the John Deere home office. This monthly statement triggered the monthly cash settlement made by the dealer with John Deere.

Pursuant to John Deere's financing policies, designed to facilitate retail sales which were the sine qua non of their ultimate profits, "credits" were tentatively allowed on the monthly statement for used machinery held by the dealer and received by him as tradeins in connection with the sale of new machinery. Such "credits" were effectuated by the dealer's execution of "floor plan notes" which operated to vest John Deere with a security interest in the used machinery to the authorized amount of the floor plan note. (This authorized amount, during 1969, often was less than the amount actually allowed by the dealer in the retail exchange—thus imposing a cash burden on the dealer.) It is the dealer's alleged falsification of such floor plan notes which gives rise to all five objections to discharge here presented for review. (Consideration of the some 19 additional objections was deferred by the referee.)

Section 14c of the Bankruptcy Act provides, inter alia, as follows:

> The court shall grant the discharge unless satisfied that the bankrupt has
>
> . . .
>
> (3) while engaged in business as a sole proprietor . . . obtained for such business money or property on credit or as an extension or renewal of credit by making or publishing or causing to be made or published in any manner whatsoever a materially false statement in writing respecting his financial condition . . .

It is clear that the bankrupt here is engaged in business as a sole proprietor and that the monthly statements and accompanying floor plan notes are written statements respecting his financial con-

dition. The issues raised by the instant petition are hence confined to the following: (1) Were the bankrupt's statements in question "materially false?" (2) Did the bankrupt "receive money or property on credit" from John Deere through the monthly settlements? (3) If the bankrupt did receive credit within the meaning of the Bankruptcy Act, did he receive this credit "on the basis of" the identified written statements; i. e., did John Deere truly rely on the bankrupt's statements in granting him the credit? The bankrupt is entitled to discharge if the answer to any of the above inquiries is negative.

## I.

■ With regard to the issue of falsification, two subsidiary questions arise. In order to be "false", the statements must have been erroneous and have been made with an intention to deceive. Feldenstein v. Radio Distribution Company, 323 F.2d 892 (6th Cir., 1963); In Re Ostrer, 393 F.2d 646 (2nd Cir., 1968); Clancy v. First National Bank of Colorado Springs, 408 F.2d 899 (10th Cir., 1969).

. Although the record reveals some dispute as to whether or not some or all of the challenged floor plans were actually factually erroneous when executed by the bankrupt, the referee has made extensive detailed findings that the subject documents did contain untrue factual assertions. These findings appear to be soundly based and are entitled to respect by this court.

As to the matter of deceitful intention, the referee has made no specific findings, although he clearly expressed the general conclusion that the bankrupt executed a false statement of financial condition. From McDowell's extensive testimony in the hearing before the referee, it is clear that McDowell was aware as he signed them that certain documents were factually inaccurate. A substantial question arises, however, as to whether or not the bankrupt really intended to fool anybody at John Deere regarding his financial condition.

■ In view of the constant and extensive supervision and auditing performed by John Deere, elaborated upon in III below, it seems quite plausible that the bankrupt may have merely intended, by his erroneous entries, to facilitate bookkeeping adjustments and manipulations thought by him (whether correctly or incorrectly) to be sought by John Deere. Surely, the fact of heavy cash flow to John Deere from the bankrupt, detailed in II below, weighs against the inference of an intention to avoid proper obligations. Absent specific findings by the referee on this subject, this court is free to make its own determinations simply upon its assessment of the preponderance of the evidence. It seems most likely that, in fact, McDowell merely signed anything just to keep John Deere off his back.

## II.

The referee made a finding that by way of the monthly statements and subsequent action by the home office, credit was advanced to the bankrupt. The bankrupt asserts, and the record confirms, that, in fact, during the months relevant to John Deere's objections to discharge, the cash flow was decidedly *from* the bankrupt toward John Deere. The testimony in the record reveals without contradiction that during the four months before bankruptcy, from June 30 to November 10, 1969, McDowell made net cash transfers to John Deere amounting to $91,325.34. During the preceding two months, McDowell paid a net total of $10,895. This combined six-month period covers the times relevant to all five objections to discharge. Indeed, during the first ten months of 1969, despite the fact that he was insolvent and on the verge of this bankruptcy, the bankrupt made unprecedented cash payments to the objectors. Despite severe economic conditions, reduced sale opportunities and restricted financial assistance, Mr. McDowell made gross cash payments to John Deere in a sufficiently large amount (roughly $350,000) to win a prize from John Deere in the form of an all-expenses-paid vacation trip to Hawaii.

Of course, it is certainly true that there may be an "extension of credit" in one direction despite a net cash flow in the opposite direction. Conceivably, the bankrupt could have owed more cash had he not benefitted from the written misrepresentations in the floor plan notes and monthly statements. Nevertheless, the impressive flow of cash away from the bankrupt during these severe economic times strongly militates against the proposition that he obtained real financial benefit from the challenged dealings. It seems much more reasonable to infer from these facts that only intangible, virtually meaningless, paper balances were affected by McDowell's written representations. The theme of Section 14c(3) is that one who derives financial benefit or gain by way of deception is not entitled to a bankruptcy discharge despite the liquidation of his estate. The dominant message from this record is quite to the contrary.

However John Deere was fooled, it did not lose any money as a result. This bankrupt was manipulated, threatened, pressured and cajoled into disgorging virtually every penny he could muster. When this effort still fell short of the monthly paper obligation, John Deere permitted the bankrupt to show a paper balance so as to afford him another month's opportunity to generate liquid assets for the benefit of the parent company's insatiable appetite. Everything on the dealer's floor was "inventoried" by way of the floor plan notes through the territorial manager. The equitable benefactor of the entire one-way interaction was surely not the bankrupt. The record does not reveal him to be a wrongdoer or a conniver. Rather, it reveals him to be a severely hard-pressed entrepreneur scrambling to satisfy the ceaseless demands of an uncompromising corporate structure.

### III.

▮▮▮ Petitioner's strongest ground is on the issue of reliance. Even if it were granted that he knowingly executed false statements respecting his financial condition and that he received money on credit at the time of the monthly settlements, the bankrupt is entitled to discharge if it appears that the objector did not extend the credit "on the basis of" the false statements. Regrettably, the referee's opinion reflects a lack of appreciation of the significance and scope of this issue. His findings on this crucial point are very brief and merely conclusory, unsupported by any specific analysis of the record. The referee simply asserts, at page 16 of his opinion:

> I find that John Deere made reliance upon the written representations that were made by Mr. McDowell to obtain credit and that credit was given in reliance thereon.

During the three-day hearing conducted by the referee regarding these objections to discharge, the bankrupt introduced extensive testimony on the subject of reliance. This was the major thrust of his defense. He detailed the degree of supervision and extent and frequency of John Deere auditing activities. (Transcript, p. 285) He testified as to the precision with which the home office credit manager was familiar with the bankrupt's financial condition. (Transcript, page 307) Yet, at page 303 of the transcript, following much significant testimony along these lines, the referee commented:

> All right, we have spent quite a bit of time on something that doesn't seem to be directed at the issues here.

In his opinion, the referee elaborates upon his finding of reliance simply by explaining his judgment that John Deere did not know of the specific deceitful practices of the bankrupt. But this does not cover the full range of the reliance issue. Surely, if John Deere knew of the actual facts relating to the challenged statements, then there could be no reliance, but *even if* they were unaware of the specific facts involved, they did not rely on the statements made by Mr. McDowell. Instead, it is clear that they did extend whatever credit they extended only on the basis of their inde-

pendent evaluation of the bankrupt's financial condition.

Since the referee was the trier of fact in the first instance, his findings of fact should be adopted by this court "unless clearly erroneous". Federal Rule of Civil Procedure 53(e)(2). This standard has been clarified by the Supreme Court:

> A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

United States v. United States Gypsum Company, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

The record in the instant case definitely supports the firm conviction that John Deere extended whatever credit it actually extended from the home office on the basis of the repetitive and exhaustive inventory checks, bookkeeping audits and financial assessments made by its own field and home office agents, and not in reliance on representations made by the dealer.

The record reveals that territory managers of John Deere made regular detailed monthly investigations of the bankrupt's inventory. In addition, field accountants made periodic as well as unannounced audits of the bankrupt's books and records. Additional service personnel, warranty claims adjusters and the like made frequent visits to the dealer's premises. The bookkeeping system used by McDowell was John Deere's own system; his bookkeeper was schooled by John Deere; the posting of accounts and transactions was closely supervised by Mr. Waters of John Deere. In addition, the record shows that occasionally John Deere managerial personnel would inspect the bankrupt's premises, interrogate customers in the field, audit the books and otherwise investigate McDowell's financial condition. In fact, one such thorough examination was conducted on April 17 and 18, 1969, just for to the occurrences which are the subject of the objections raised in these proceedings. At that time, the Lansing credit manager, Mr. Casey, together with the retail credit manager, Mr. Pletcher, and two other men inspected the McDowell business. At that time, Mr. Casey spontaneously made a precisely accurate estimation of McDowell's over-all financial condition, observing that the dealer was "about $75,000 short" of collateral to cover outstanding obligations. Yet, despite this uncannily accurate assessment, John Deere proceeded to continue its financing of McDowell's enterprise, after extracting all of McDowell's available cash reserves (some $17,000). Whether or not John Deere knew of the bankrupt's exact interest in specific pieces of machinery, it cannot disclaim a thorough awareness of his credit standing and financial condition.

This court is well aware of cases holding that mere demonstration of an independent investigation by a creditor-objector does not preclude a finding of reliance under Section 14c(3), but such cases inevitably involve statements made by the bankrupt in more or less arms-length dealings with a third party lender. The objectors in the instant case are no such distant or detached parties. John Deere all but owned McDowell. It held a comprehensive mortgage over virtually everything the bankrupt owned. It not only had full access to the bankrupt's books, it was actively involved in their preparation. It knew that at the time of the monthly settlements, the bankrupt, during a hectic business day, signed literally dozens of forms, statements and notes completed by John Deere personnel. It itself imposed great pressure on the bankrupt. John Deere did not even rely on statements collected and prepared by its own agents, the territorial managers, without double-checking facts and figures at the home office. The transactions challenged here were, in reality, entirely in-house dealings.

In such circumstances and upon evidence of such complete knowledge of the bankrupt's affairs held by the objectors,

this court must not unrealistically restrict its perspective to the isolated narrow transactions focused upon by the objectors. This court of equity is not limited to such a fettered view.

It is clear from this record that John Deere, faced with the pressing economic circumstances of 1969, in great need of liquid capital, and desirous of ultimately constricting and centralizing its corporate affairs, embarked upon a policy of squeezing all available cash out of its independent dealer and then forced him out of business, all the while preserving technical grievances which might serve to defeat a bankruptcy discharge. (This court takes notice of the fact that McDowell was forced to file his voluntary petition so as to block John Deere confiscation of all his business property.)

The relief requested by petitioner is granted. The objections to discharge are denied.

It is so ordered.