In the Matter of Roscoe Wilson SIMMS, Bankrupt.

No. 19848.

United States District Court
E. D. Virginia,
Norfolk Division.
March 14, 1962.

**912**

R. Baird Cabell, Franklin, Va., for petitioning creditor, Bracey.

J. Edward Moyler, Jr., Franklin, Va., for bankrupt.

Frank R. Watkins, Suffolk, Va., trustee in bankruptcy.

WALTER E. HOFFMAN, Chief Judge.

The bankrupt, a farmer, gave to the Seaboard Finance Company, Franklin, Virginia, a written false financial statement with an intent to deceive the lending institution as to his true financial condition. The company, relying upon this statement, made a loan in the sum of $600.00 on January 30, 1959, which loan was in full payment of an existing loan with additional cash being advanced to the bankrupt to make the indebtedness $600.00. He filed his voluntary petition in bankruptcy on December 8, 1960. Specifications of objections to the discharge were filed by another creditor, Leroy R. Bracey, contending that the bankrupt "while engaged in business as a sole proprietor, obtained for such business money or property on credit or as an extension or renewal of credit by making or publishing or causing to be made or published a materially false statement in writing respecting his financial condition."

We are called upon to determine the status of a farmer in light of the 1960 amendments to § 14 of the Bankruptcy Act, 11 U.S.C.A. § 32, sub. c(3), and a related amendment to § 17 of the Act, 11 U.S.C.A. § 35, sub. a(2). The question is of first impression. While the record is not clear as to the extent of the bankrupt's farming operations, it appears that he operated a farm for one J. Milton Babb; that he did not own the real estate upon which the farming operations were conducted, but did own and operate farm equipment and arranged for the marketing of his product, the proceeds of which were apparently divided on a "share basis" with the owner of the realty.

■■ The Referee granted the discharge except as to such debts which were not affected by a discharge. It is manifestly clear that the Seaboard Finance Company debt is not affected by the discharge under § 17 of the Act. The Referee accepted the language "engaged in business as a sole proprietor" to mean the usual acceptation of the term "operating some commercial enterprise," such as a store or other related activity, and determined that this would not include a farmer. While not prepared to say that all farmers are excluded from the impact of § 14, sub. c(3) of the Act, the Court is of the opinion that, subject to the right of the objecting creditor to request more specific findings as to the nature of the bankrupt's operations, the Referee was correct in granting the discharge.

If we are to accept the literal language of the 1960 amendments, there would be little doubt as to the correctness of the position advanced by the objecting creditor. Section 14 reserved to the court the right to refuse a discharge in bankruptcy to any bankrupt making a materially false statement in writing respecting his financial condition "while engaged in business as a sole proprietor, partnership, or as an executive of a corporation." The quoted words are contained within the 1960 amendment to § 14, sub. c(3) for the first time; formerly the discharge could be refused to any bankrupt making or publishing a materially false statement in writing respecting his financial condition. Thus, prior to the amendment, farmers, wage earners, doctors, lawyers, retired persons, and all others were subjected to the harsh penalty of a denial of discharge as to *all* debts in making a false financial statement.

In examining the legislative history of the 1960 amendment to determine the intent of Congress we find the avowed purpose "to limit the use of false financial statements as a bar to discharge in bank-

ruptcy."[1] The report of the House Committee on the Judiciary confirms this purpose in stating:

"The committee believes that complete denial of a discharge is too severe a penalty in the case of the individual noncommercial bankrupt. It is also a penalty which experience has shown to be subject to abuse."

The House Report further comments:

"[T]he exercise of [the creditor's] right to bar the discharge completely results in a windfall for other creditors who are not even aware of such a statement. Debts which are dischargeable are not discharged solely because one of many debts was induced by a false financial statement. This result is not required to protect a creditor who has relied on a false financial statement since under section 17a(2) that particular debt is not dischargeable."

The legislative history draws a clear line of demarcation between one engaged in "business" and one engaged in "noncommercial activities." The House Report, in considering the word "business," has this to say:

"The situation is somewhat different in the case of a business bankrupt. The businessman is more likely to be aware of the severe consequences to him of issuing a false financial statement. His ordinary business records enable him to produce a more accurate statement than a householder who may have a multitude of small debts and no records. Furthermore, the financial statement issued by a businessman is frequently for the purpose of establishing credit standing in the community. His creditors may never see the financial statement itself. On the other hand, the non-business debtor normally issues his financial statement to a particular creditor as a part of his application for credit or for a loan. That creditor already has the protection of non-dischargeability under section 17."

Is a small-time farmer a person who is "more likely to be aware of the severe consequences" of issuing a false financial statement because of his "business" records and experience? Was the false financial statement here involved issued "for the purpose of establishing credit standing in the community," or was it given to a particular creditor as a part of the application for a loan? The answer, it is submitted, is obvious.

Manifestly a farmer is engaged in "business" if we are to accept the term literally. Merely to say that one conducting farming operations is not engaged in business is an avoidance of the issue. As was said in First National Bank & Trust Co. of Bridgeport, Conn., v. Beach, 301 U.S. 435, 439, 57 S.Ct. 801, 803, 81 L.Ed. 1206, in considering § 75 of the Bankruptcy Act:

"He was in that business or in none. He was either a farmer or a man of leisure."

To the same effect, see Chaney v. Stover, 4 Cir., 123 F.2d 945, 946.

The contention of the bankrupt that he was not engaged in business as a "sole proprietor" because he did not own the land upon which his farming business was conducted does not impress the court. He owned the equipment and operated a farming business. True, the fact that he was the cultivator of land and by way of compensation received a share of the crops or, stated differently, a share of the proceeds from the sale of crops, should go far in reaching the intent of Congress as he is, in effect, a substitute for a wage earner hired to produce a crop.[2]

1. 1960 Code Congressional and Administrative News, Vol. 2, p. 2954, Senate Report 1688.

2. See discussion in Law of Farm Tenancies in Virginia, p. 9, under heading "Crop-pers," published in 1958 by the Agricultural Experiment Station, Virginia Polytechnic Institute, in cooperation with the University of Virginia Law School.

We turn to what Congress intended by the use of the word "business" in amending § 14 of the Bankruptcy Act. The Committee reports, as suggested, contrast "business" activity with "non-commercial" activity. As the amendments to § 14 and § 17 were a part of the same law (Pub.L. 86–621) the two statutes must be considered together in arriving at the congressional intent. "Commerce" may be defined as "the exchange of goods, productions, or property of any kind." A fair interpretation of what Congress was attempting to do in amending § 14 and § 17 would lead to the reasonable conclusion that Congress meant to retain under § 14, sub. c(3) that type of business which is mercantile in character—one that is with regularity engaged in buying, selling and trading.

If the defrauded creditor is to be protected under § 17, sub. a(2) with respect to a farmer-bankrupt, it logically follows that he is not the type bankrupt who should be denied a discharge under § 14, sub. c(3). Indeed, to accept the arguments of the objecting creditor would result in restricting the effect of § 17, sub. a(2) to wage earners and retired persons. We do not believe that Congress intended to be so restrictive, as is evidenced by its reference to (1) the windfall to other creditors, (2) the abuses that have arisen by reason of the former provisions of § 14, (3) the "commercial activity" as contrasted with "non-commercial activity" and (4) the record keeping responsibilities of the bankrupt.

It may well be that Congress, by analogy, has characterized the bankrupt who issues a false financial statement in writing as one who should be denied a discharge under § 14, sub. c(3), provided that he is the type bankrupt who would not be excused from keeping and preserving books of account or records under § 14, sub. c(2). This Court visualizes that there may be farmers whose operations are such that the issuance of false financial statements are made for the purpose of presenting a false picture to the community at large, rather than for the purpose of defrauding an individual creditor. The same may be true as to an attorney, physician, etc. Depending upon the type of activity conducted and the purpose for which the financial statement is issued, the classification of each particular bankrupt must stand to determine whether he is subjected to the harsh provisions of § 14, sub. c(3) or the more equitable terms of § 17, sub. a(2).