**James Kendall CLANCY, Appellant,**

v.

**The FIRST NATIONAL BANK OF COLORADO SPRINGS, Appellee.**

**No. 10038.**

United States Court of Appeals
Tenth Circuit.

March 28, 1969.

Rehearing Denied May 12, 1969.

Thomas J. Mitchell, Paul B. Rodden and Rodden, Cooper, Woods & Mitchell, Denver, Colo., for appellant.

Byron L. Akers, Jr., and Haney, Howbert & Akers, Colorado Springs, Colo., for appellee.

Before JONES*, Senior Judge, Court of Claims, and BREITENSTEIN and HICKEY, Circuit Judges.

JONES, Senior Judge.

This is an appeal from an order of the District Court for the District of Colorado, In Matter of Clancy, 279 F.Supp. 820, which reversed the decree of the Referee in a bankruptcy proceeding. The Referee overruled the objections filed by the bank and granted the bankrupt a discharge. The District Judge reversed the order of the Referee and 'denied the bankrupt a discharge.

Appellant filed a voluntary petition in bankruptcy on March 10, 1967, and was adjudicated a bankrupt on that date. On September 1, 1967, the First National Bank (Appellee) filed specific objections to a discharge in bankruptcy. On October 18, 1967, a hearing was held before a Referee in Bankruptcy, at which hearing considerable testimony was taken. After the hearing, December 19, 1967, the Referee found that the financial statement which was submitted by the bankrupt was not materially false and that the bank could not sustain its objection because it had not relied substantially on the financial statement. The Referee further found that the bankrupt was engaged in a business within the meaning of § 14, sub. c(3) of the Bankruptcy Act.

After an oral argument on the petitions for review, the district court on February 21, 1968 reversed the Referee's findings ruling that the Referee was clearly erroneous in his findings concerning the financial statement, but affirmed the Referee's finding that the bankrupt was engaged in a business within the meaning of § 14, sub. c(3).

Appellant Clancy by his own acknowledgement, was a professional trader in the market and this was his only business activity from 1965 until bankruptcy in 1967. During this time, he had no other job and his only office was at the stockbrokers office at Boettcher and Company. He had been dealing solely in stock trading and had been engaged in transactions which involved many thousands of dollars.

On February 6, 1967, Clancy applied for an unsecured loan of $16,000.00. He had overbought his position in the stock market and needed the funds to meet a margin call on his stock trading account at Boettcher and Company. He applied for the loan at the First National Bank of Colorado Springs, the Appellee. Mr. Thomas Moon, the bank's president, requested a written financial statement since it was required in making an unsecured loan.

Clancy provided the financial statement showing that he and his wife had a combined net worth of $2,119,800.00 with total assets of $2,188,800.00 and total liabilities of $69,000.00. Though submitted as a joint financial statement of Mr. and Mrs. Clancy, it was signed only by the applicant, Clancy. While he listed $69,000.00 as the total liabilities, he, at the time of the application, was obligated to two other banks on secured loans totaling $150,000.00: $120,000.00 at the Central Colorado Bank and $30,-

000.00 at the Colorado Commercial Bank, both of Colorado Springs. The Appellant did not disclose the existence of either of these loans to Banker Moon and the banker had no knowledge of them when he made the loan. In fact, only 3 days prior on February 3, 1967 to the date of the loan from appellee bank, Clancy had obtained the $120,000.00 loan from the Central Colorado Bank.

Apparently these loans in February were not enough to save Clancy from bankruptcy in March when he filed a voluntary petition in bankruptcy, only a month after he negotiated the unsecured loan.

Appellee bank objected to the general discharge of the bankrupt under § 14, sub. c(3) of the Bankruptcy Act, 11 U.S.C.A. § 32 sub. c, which reads in pertinent part as follows:

> The court shall grant the discharge unless satisfied that the bankrupt has * * * (3) obtained money or property on credit, or obtained an extension or renewal of credit, by making or publishing or causing to be made or published in any manner whatsoever, a materially false statement * * *.

After a hearing, the Referee found that (1) the bankrupt was engaged in business within the meaning of the Bankruptcy Act, (2) the financial statement was not materially false and that the bankrupt's misrepresentation was not intentional, and (3) there was not actual reliance upon it by the bank.

We agree with the findings of the Referee only as to number 1, and agree with the district court's rejection of findings 2 and 3.

The determination of the Referee that the bankrupt was engaged in "business" within the meaning of the Bankruptcy Act was affirmed by the district court. We believe this conclusion to be correct. The bankrupt not only spent all of his time buying and selling stock but he testified that he considered himself to be a "professional trader under the rules of the S.E.C." Every business day since December of 1965, he had been involved in stock transactions at his only office at Boettcher and Company, and these activities were his only source of income.

In 1960, the Congress amended § 14, sub. c to give the court the right to refuse a discharge in bankruptcy to any bankrupt making a materially false statement in writing respecting his financial condition "while engaged in business as a sole proprietor, partnership, or as an executive or a corporation." [1]

The courts have long struggled with the term "business" and what is meant by it. It was stated in In re Green's Estate, 109 Misc. 112, 178 N.Y.S. 353, 360 (1919):

> How equivocal the noun "business" really is will be readily perceived by trite examples. * * * If I go a-fishing in this state, I am not a-doing business there; but if a fishmonger goes a-fishing to replenish his stall in this city, he is doing business within the Tax Law. It is because of the ambiguity denoted that the courts properly say that the colloquial word "business" if used in statutes is among the most indefinite in the English language.

Though concluding that a bankrupt sharecrop farmer was not engaged in "business" within the purview of amended § 14, sub. c(3), the court in In re Simms, 202 F.Supp. 911 (E.D.Va. 1962), examined the legislative history of the 1960 amendment in its effort to determine the intent of the Congress. The court states at pages 913, 914:

> The legislative history draws a clear line of demarcation between one engaged in "business" and one engaged in "non-commercial activities." * *

---

1. The quoted words were added for the first time in the 1960 amendment. Prior to that amendment, farmers, wage earners, retired persons, and many others were subjected to the harsh penalty of a denial of discharge as to all debts if they made a false financial statement as to a wholly non-commercial matter.

\*   \*   \*   \*   \*   \*

We turn to what Congress intended by the use of the word "business" in amending § 14 of the Bankruptcy Act. The Committee reports, as suggested, contrast "business" activity with "non-commercial" activity. \* \* \* A fair interpretation of what Congress was attempting to do in amending § 14 and § 17 would lead to the reasonable conclusion that Congress meant to retain under § 14, sub. c(3) that type of business which is mercantile in character—one that is with regularity engaged in buying, selling and trading.

Certainly, the bankrupt was engaged in business when professionally buying and selling stocks. He had no other source of income and no other job. This was his exclusive business. He also was required to keep records for all his transactions because of the tax consequences. It is significant that in the *Simms* case, *supra*, the court uses the bankrupt who is covered by the 1960 amendment as the one "who would not be excused from keeping and preserving books of account or records under § 14, sub. c(2)." Id. at 914.

The Referee found that the financial statement was not materially false even though the bankrupt was fully aware that he had omitted over $150,000.00 liabilities to two other banks. The district court reversed such finding as clearly erroneous.

We agree with the court that the financial statement was materially false. The bankrupt submitted to the bank a misleading financial statement in order to get an unsecured short-term loan of $16,000.00 from the bank on February 6, 1967. But only 3 days prior, on February 3, the bankrupt had acquired liabilities of $150,000.00 which he failed to list. The financial statement also failed to show that most of the assets on this financial statement belonged to his wife, and actually at the time of the loan he was insolvent with debts of $210,000.00 and assets of $80,000.00.

From the bankrupt's own testimony it is clear that he was fully aware of the two secured-note obligations of $150,-000.00 in liabilities, which he failed to disclose on the financial statement. Even the Referee found that "the evidence is clear that the Bankrupt was fully aware of the debts which he did not disclose." The only explanation offered by the bankrupt to excuse these omissions is that he thought these debts were immaterial for a $16,000.00 loan, verbally okayed, that he thought in terms of the "general realm" of business assets and liabilities and that both of the omitted loans were secured. But the bankrupt also failed to disclose on his financial statement that he had pledged substantial assets as collateral in order to secure the two loans totaling $150,-000.00.

Indeed, the bankrupt's own testimony is very confusing and inconsistent and varies materially as to his own assets and liabilities. On February 6, 1967, the bankrupt estimated that his liabilities approximated $210,000.00 and that his assets were $80,000.00. Yet he testified that he told Mr. Moon that the only assets he himself owned were 2,000 shares of Reichhold Chemical stock plus a "few shares of Texas Gulf Sulphur," and that all the rest belonged to his wife. In fact, he did not even own the Reichhold Chemical stock free and clear, since this stock was subject to a margin call by Boettcher and Company for which the loan was made. Only 32 days after his loan at the First National Bank had been approved, the bankrupt filed a voluntary petition in bankruptcy showing assets of only $3,654.91 and liabilities totaling $237,574.27. These numerous contradictions which appear throughout the bankrupt's own testimony can but point to the one conclusion that he intentionally misrepresented his true financial status to the bank.

This court has held that more than an erroneous financial statement is necessary for a statement to be considered "false." It must be one that is intentionally false or one that is intended

to deceive and must be relied upon. American National Bank of Denver v. Rainguet, 323 F.2d 881 (C.A. 10th Cir. 1963).

After reviewing the evidence, we find that there is substantial evidence to support the district court's finding of an intent to deceive on the part of the bankrupt when he submitted the false financial statement. From his own testimony, the bankrupt failed to disclose not only the two very large loans, but that most of his assets had already been pledged as security in these loans, and that even the stock that he claimed to own free and clear was actually pledged for a margin call.[2]

The bankrupt painted a rather sunny picture of his financial condition when actually he knew he was hopelessly insolvent. He testified he told the banker that most of the assets belonged to his wife except the Reichhold stock and a few shares of Texas Gulf Sulphur. But he made no mention of his large indebtedness that he had undertaken only 3 days prior. Nor did he tell the banker that the Reichhold stock was not free and clear. There is substantial evidence and circumstances to support the court's finding that there was material deception and that the deception was intentional. The court further found that the testimony of the banker is that the bank would not have made the loan, had it not been misled; and that he relied in substantial part at least on the financial statement. Thus, the reviewing judge was correct in finding "[i]t strains the evidence to say that the deception was not intentional."

It has been held that where a district court rejects the Referee's findings as clearly erroneous, the court of appeals applies the clearly erroneous test to the decision of the Referee rather than the district court. Potucek v. Cordeleria Lourdes, 310 F.2d 527, 530 (C.A. 10th 1962).

The Supreme Court has laid down a clear guide in testing what is "clearly erroneous" in the case of United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), by saying:

A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

 A review of the entire evidence convinces us that a mistake has been made by the Referee in his findings as to the falsity of the financial statement and the reliance upon it. The Referee was correct in his findings that the bankrupt was engaged in business with § 14, sub. c(3) of the Bankruptcy Act.

Affirmed.

---

2. The record is silent as to where the proceeds of the sale of this stock went.