In the Matter of Jerome Ross **WEINER** et al., Bankrupts.

Jerome Ross **WEINER** and Wife, Barbara Beck Weiner, etc., et al., Appellants,

v.

**NATIONAL BANK OF COMMERCE OF DALLAS** and Lubbock National Bank, Appellees.

No. 72–1472

Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

Nov. 16, 1972.

Donnie R. Duplissey, Dean Carlton, Dallas, Tex., for appellants.

Morris I. Jaffe, W. Randolph Elliott, John M. Gray, Acting Chairman of the Executive Committee, Dallas, Tex., for National Bank of Commerce.

Aubrey J. Fouts, Lubbock, Tex., for Lubbock National Bank.

Before WISDOM, GODBOLD and RONEY, Circuit Judges.

RONEY, Circuit Judge:

This appeal turns on but one question: did the bankruptcy court err in

* Rule 18, 5th Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5th Cir. 1970, 431 F.2d 409, Part I.

denying a bankrupt a general discharge under Section 14(c)(3) of the Bankruptcy Act, 11 U.S.C.A. § 32(c)(3), because, while engaged in business, he obtained money for that business on credit by making a materially false financial statement? The bankrupt's use of a materially false statement to obtain money is not challenged. The applicability of Section 14(c)(3) turns on whether, under the facts of this case, the bankrupt was engaged in a business for which the money was obtained. We hold that he was and affirm the denial of a general discharge.

In 1966, Jerome Ross Weiner, the bankrupt, bought a controlling interest in a life insurance company. In financing his venture, Weiner gave a materially false financial statement to certain banks, including the two objecting creditors, National Bank of Commerce of Dallas and Lubbock National Bank. Relying on this statement, the objecting banks loaned Weiner $355,000 which he used to purchase controlling stock in Midwestern Investors Life Insurance Company. Shortly thereafter, the insurance company went into liquidation, Weiner's stock became worthless, and he filed a voluntary petition in bankruptcy. The Referee denied his discharge, the District Court affirmed without additional evidence, and Weiner now appeals.

Section 14(c)(3) of the Bankruptcy Act provides:

> "The court shall grant the discharge unless satisfied that the bankrupt has . . . (3) *while engaged in business* as a sole proprietor, partnership, or as an executive of a corporation, *obtained for such business* money or property on credit or as an extension or renewal of credit by making or publishing or causing to be made or published in any manner whatsoever a materially false statement in writing respecting his financial condition or the financial condition of such partnership or corporation. . . ."

11 U.S.C.A. § 32(c)(3). (Emphasis added).

Weiner seeks to escape the provisions of this section with a three-pronged argument. *First,* he contends that he did not obtain the loan "while engaged in business." Rather, he asserts that he obtained the loan to acquire the business. *Second,* Weiner contends that he did not obtain the loan "for such business," but rather obtained the money to purchase Midwestern Investors stock. Hence, the money went not into the insurance company business but to the seller of the stock. *Third,* Weiner asserts that the allegedly false financial statements stated his personal financial condition and not that of the insurance company.

These three arguments beg the question. Instead of posing the question for decision, they each assume that only the business of Midwestern Investors was involved. The Referee, however, found that Weiner "was engaged in the business of acquiring controlling interest in Midwestern." He thus found that Weiner's business was something different than the business of the corporate Midwestern Investors. This finding gives the case a slightly different twist. Unless the Referee is wrong on this point, we do not reach the points that Weiner argues. Both the evidence and the law support the Referee's conclusion.

In early 1965, Weiner formed a company called Western States Life Insurance and was its president until he resigned in July of that year. Weiner then searched for another insurance company to own and, after examining ten or fifteen companies, he bought the ill-fated Midwestern Investors. In September, 1966, Weiner purchased another insurance company, Midwestern Fire, which promptly went into receivership in October, 1966. This business history supports a finding that as early as 1965 Weiner was engaged in the business of buying, acquiring, and establishing insurance companies and that he was engaged in this business until his petition in bankruptcy was filed.

■ When the true nature of Weiner's business is understood, his three arguments necessarily collapse for lack of a foundation. Clearly, he obtained the loans while engaged in, and for the purpose of, his business of buying, acquiring, and establishing insurance companies, and the financial statements were not merely his individual statements but were also statements of the financial health of his single proprietorship business.

■ This result comports with the Congressional purpose underlying Section 14(c)(3), that is, to differentiate between the business bankrupt and the noncommercial bankrupt. Prior to 1960, a general discharge was denied to *any* bankrupt who "obtained money or property on credit . . . by making or publishing . . . a materially false statement in writing respecting his financial condition. . . ." Bankruptcy Act, § 32(c), ch. 579, § 6, 66 Stat. 422 (1952). In 1960 Congress changed this law. Since the change, for nonbusiness bankrupts the only effect of a false financial statement was to prevent the release of the individual debts incurred through the use of the statement. *See* Section 17(a)(2) of the Bankruptcy Act, 11 U.S.C.A. § 35(a)(2). It did not prevent a general discharge. For commercial bankrupts, however, the old rule was maintained. As to them, Congress continued in effect the provision that the use of a false financial statement to obtain any money or property on credit for his business would effectively prevent the granting of any discharge to the bankrupt. S.Rep. No. 1688, 86th Cong., 2d Sess. (1960), in U.S.Code Cong. & Admin.News at p. 2955, explains why

"[t]he situation is somewhat different in the case of a business bankrupt. The businessman is more likely to be aware of the severe consequences to him of issuing a false financial statement. His ordinary business records enable him to produce a more accurate statement than a householder who may have a multitude of small debts and no records. Furthermore, the financial statement issued by a businessman is frequently for the purpose of establishing credit standing in the community. His creditors may never see the financial statement itself. On the other hand, the nonbusiness debtor normally issues his financial statement to a particular creditor as part of his application for credit or for a loan. That creditor already has the protection of nondischargeability under section 17."

This Circuit has previously recognized the importance of this distinction in the Congressional purpose. *See* Swint v. Robins Federal Credit Union, 415 F.2d 179 (5th Cir. 1969).

Although no cases in point have been cited to us, the few cases that have dealt with the "business" aspect of Section 14 tend to follow the business debtor-nonbusiness debtor distinction underlying the 1960 amendment to Section 14(c)(3). In Re Branch, 242 F.Supp. 534 (E.D.Tenn.1964), aff'd sub nom. Branch v. Mills & Lupton Supply Co., 348 F.2d 991 (6th Cir. 1965), cert. denied, 382 U.S. 997, 86 S.Ct. 584, 15 L. Ed.2d 484 (1966), held that the business of an individual engaged in constructing shell homes came within the meaning of Section 14(c)(3). In Re Doyle, 272 F. Supp. 35 (S.D.N.Y.1967), held that a self-employed tile setter met the "engaged in business" requirement of Section 14(c)(3). In Re Clancy, 279 F. Supp. 820 (D.Colo.1968), aff'd sub nom. Clancy v. First National Bank of Colorado Springs, 408 F.2d 899 (10th Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 430, 24 L.Ed.2d 422 (1969), held that an individual whose sole income was derived from buying and selling securities was "engaged in business" within the meaning of Section 14(c)(3). Weiner cites In Re Simms, 202 F.Supp. 911 (E.D.Va. 1962), which held that a small-time share crop farmer was not a businessman within the meaning of Section 14(c)(3), but this case affords him little if any support. The Court in *Simms* emphasized that the small-time noncom-

**990**

mercial farmer there involved was not the knowledgeable kind of business bankrupt that Congress intended to bring within the harsh provisions of Section 14(c)(3). Both this Circuit, in Swint v. Robins Federal Credit Union, *supra*, and the Tenth Circuit, in Clancy v. First National Bank of Colorado Springs, *supra*, have refused to extend the holding of the *Simms* case beyond its facts. All of these holdings are consistent with the distinction Congress has made between the individual householder with limited experience in commercial credit transactions and the knowledgeable, sophisticated, and business-oriented commercial debtor, who is held to a higher standard of conduct. The Referee correctly placed Weiner within this latter class: knowledgeable, educated in law and business administration, and very experienced in insurance matters and financial affairs since he borrowed extensively throughout his lifetime.

Weiner contends that the Referee engrafted a new provision onto Section 14(c)(3) by holding that a "business purpose" is all that is necessary to deny a general discharge and by holding that a loan to "acquire a business" is the same as a loan "for his business." We do not reach such broad effect into the holding in this case. Weiner himself asserts that he was in the insurance business. The purchase of Midwestern Investors was not an isolated transaction. The history of Weiner's "insurance business" shows that he has been in charge of two or three agencies or companies; he has been employed as the executive in some companies; he has acquired control of some insurance companies; and he has founded an insurance company. While engaged in this "insurance business" he often borrowed large sums of money. The record amply supports a conclusion that Weiner's acquisition of the controlling interest of Midwestern Investors was well within the framework of his "insurance business" and that the money borrowed through use of the false financial statement was obtained "for such business."

Although the objecting banks cross appeal from the District Court's affirmance of the Referee's determination that Weiner should not be denied a discharge under Sections 14(c)(2) (failure to keep books or preserve books of account) and 14(c)(7) (failure to explain loss of assets), we need not consider these arguments because we hold that the discharge was properly denied under Section 14(c)(3).

Affirmed.