**In the Matter of John Arthur LIND and Catherine Franks Lind, Bankrupts.**

**E. J. BUTLER, Jr., Plaintiff,**

**v.**

**John Arthur LIND, Defendant.**

**Bankruptcy Nos. 75–HB–142, 75–HB–143.**

United States Bankruptcy Court,
S. D. Texas,
Houston Division.

April 9, 1980.

Paul W. Nimmons, Jr., Houston, Tex., for E. J. Butler, Jr.

Lowell T. Cage, Houston, Tex., William Vincent Walker, Houston, Tex., for John A. Lind, M.D.

## MEMORANDUM OPINION COMPLAINT OBJECTING TO DISCHARGE

JOHN R. BLINN, Bankruptcy Judge:

The matter is before the Court on the complaint of E. J. Butler, Jr., a creditor, objecting to the discharge of John A. Lind, M.D., the bankrupt.[1] Mr. Butler alleges that Dr. Lind committed the act set out in § 14(c)(3) of the Bankruptcy Act in that on various occasions while Dr. Lind was engaged in business he obtained for those businesses money or property on credit or an extension or renewal of credit by making or causing to be made or published a materially false statement in writing respecting his financial condition.

At the time of filing and this trial, Dr. Lind was a physician primarily employed in solo practice as a radiologist. For a number of years prior to the bankruptcy filing Dr. Lind had invested and been involved in a number of small ventures unrelated to his medical practice. Some of these undertakings involved capital investments and participation in the formation of certain small business enterprises, such as Houston Mini–Mix Concrete Company and Par–finders, Inc. Other transactions consisted of buying small lots and parcels of supposedly desirable real estate both in this country and Canada.

In order to finance these various ventures, Dr. Lind on numerous occasions approached several banks and lending institutions about procuring loans. To obtain the loans Dr. Lind submitted financial statements, generally prepared by himself, purporting to reflect his overall financial condition and liquidity. Mr. Butler argues the ventures for which the money was obtained constituted "businesses" (although secondary to the practice of medicine) in which Dr. Lind was engaged. In addition he contends the financial statements submitted by Dr. Lind were materially false as they grossly overstated the value of certain assets held by Dr. Lind while omitting liabilities, thus making Dr. Lind appear more financially secure than he actually was. Without such inflated figures, Mr. Butler alleges Dr. Lind would have presented a much less desirable financial picture and consequently would never have received such loans.

Dr. Lind responds to Mr. Butler's allegations by arguing that the financial statements were prepared in good faith with no intent to deceive, that any errors made were the result of mere negligence and not intentionally, knowingly or recklessly done, that his various ventures represented passive investments as opposed to "businesses" and that in many instances it was his substantial income as a physician and not his financial statements upon which the banks relied in extending credit.

A fair determination of Mr. Butler's allegations necessitates a careful consideration of the legislative intent behind generally granting discharges in bankruptcy cases while denying them only in certain specific and well–delineated instances. The policy behind granting discharges is to "relieve the honest debtor from the weight of

---

1. The complaint originally also named Mrs. Lind but on July 28, 1977 the action against her was dismissed.

oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934), citing *Williams v. U. S. Fidelity & G. Co.*, 236 U.S. 549, 554–555, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915). The denial of a discharge, therefore, is a punitive measure reserved solely for those bankrupts who have committed one of the specific exceptions as described in § 14 of the Bankruptcy Act. Unless one of the statutory grounds for objection to discharge is proved, the discharge must be granted. *Bluthenthal v. Jones*, 208 U.S. 64, 28 S.Ct. 192, 52 L.Ed. 390 (1908); *Matter of Robinson*, 266 F. 970 (1st Cir. 1920). Any party in interest may oppose the discharge, even one who was not defrauded by or involved in the transaction in issue. *Cunningham v. Elco Distributors*, 189 F.2d 87 (6th Cir. 1951). However, in weighing the facts put forward in a contest over a discharge the Court must bear in mind the beneficial policy of allowing honest debtors to receive a fresh start in life and thus construe § 14 strictly against the one objecting to discharge and liberally in favor of the bankrupt. *In re Tabibian*, 289 F.2d 793, 795 (2nd Cir. 1961). *In re Jones*, 490 F.2d 452 (5th Cir. 1974); *Gross v. Fidelity & Deposit Co. of Maryland*, 302 F.2d 338 (8th Cir. 1962).

The specific act alleged here falls under § 14(c)(3) of the Bankruptcy Act, which reads:

c. The court shall grant the discharge unless satisfied the bankrupt has

(3) while engaged in business as a sole proprietor, partnership, or as an executive of a corporation, obtained for such business money or property on credit or as an extension or renewal of credit by making or publishing or causing to be made or published in any manner whatsoever a materially false statement in writing respecting his financial condition or the financial condition of such partnership or corporation . . . .

Thus to prevail under this section a party must prove all of the following elements:

the bankrupt (1) obtained money or property on credit or an extension or renewal of credit (2) in reliance upon (3) a financial statement which contained information which was not in fact correct. Such false statement must have been (4) material and (5) made either intentionally or knowingly or with reckless disregard for the truth. The financial statement itself must be (6) in writing and must have been (7) made or published or caused to be made or published by the bankrupt or someone duly authorized by him. Finally, (8) the bankrupt must have been engaged in business and the money must have been obtained for such business. 1A *Collier on Bankruptcy* ¶ 14.36 at 1381–82.1 (14th ed. 1978). If even one of these elements is missing, the objection will not be sustained and the discharge granted.

The evidence adduced at trial indicates certain of these elements are not in dispute. It is clear Dr. Lind did in fact obtain money or property on credit or an extension or renewal of credit and he did so after submitting written financial statements respecting his financial condition which later proved to have overstated substantially his net worth. Dr. Lind admits in all instances he either made or published the financial statements or caused them to be made or published.

Dr. Lind disputes, however, Mr. Butler's allegations that any errors in the financial statements were made with the specific intent to defraud Dr. Lind's creditors, that the money obtained was for a business in which Dr. Lind was engaged and that in all instances the banks relied on the financial statements in extending credit to Dr. Lind.

■ Before turning to the actual transactions, we review in greater depth several of the disputed elements. A discharge will be granted if there is no showing that the party making the loan relied upon the false financial statement. *In re Little*, 65 F.2d 777 (2nd Cir. 1933); *In re Day*, 11 F.Supp. 400 (D.Mass.1935). However, even partial reliance on the false financial statement is sufficient to deny the discharge and there may be sufficient reliance to sustain the objection to discharge

even though the creditor has made an independent investigation of the debtor's financial status or has required security for the loan. *Banks v. Siegel*, 181 F.2d 309 (4th Cir. 1950); see, e. g., *In re Philpott*, 37 F.Supp. 43 (S.D.W.Va.1940); *In re Hochberg*, 17 F.Supp. 916 (W.D.Pa.1936); *In re Muscara*, 18 F.2d 606 (W.D.Pa.1927); *In re Applebaum*, 11 F.2d 685 (2nd Cir. 1926); *In re Slohm*, 10 F.Supp. 351 (W.D.N.Y.1935).

Turning to the question of what constitutes a "business," [2] case law proves to be less helpful on this point. After reviewing the cases relating to § 14(c)(3) we can find no more clearcut definition of what is meant by the term "engaged in business" other than "whether the type of enterprise is one where the borrower is a person who is 'more likely to be aware of the severe consequences' of issuing a false financial statement because of his 'business records and experience.'" *In re McCallister*, 3 C.B.C. 693, 703 (S.D.Iowa 1975) citing *In re Simms*, 202 F.Supp. 911, 913 (E.D.Va.1962). Operations that require large amounts of borrowed capital create a presumption that the bankrupt was a person fully aware of the necessity of honesty in financial statements. *In re McCallister, supra,* at 694.

■■■ Finally, looking to the issue of intent, for an erroneous financial statement to be considered "false" for the purpose of denying a discharge in bankruptcy, not only must it in fact be one that is incorrect, but it must also have been executed with actual intent to defraud. Such specific intent to deceive one's creditors can be demonstrated in one of two ways: either the false statements are intentionally or knowingly made, *Clancy v. First Nat. Bank of Colorado Springs*, 408 F.2d 899 (10th Cir. 1969), cert. den. 396 U.S. 958, 90 S.Ct. 430, 24 L.Ed.2d 422, or the statements are made with such reckless indifference to the actual facts that there are no reasonable grounds to believe

they are in fact correct. *Morimura, Avai & Co. v. Taback*, 279 U.S. 24, 49 S.Ct. 212, 73 L.Ed. 586 (1929). Where the bankrupt's financial statement, although erroneous, is not published with any intent to deceive creditors either by intentionally or knowingly stating untruths or recklessly disregarding actual facts, then the bankrupt will not be barred from discharge; on the other hand, however, "the bankrupt's unsupported assertions of an honest intent will not overcome the natural inferences from admitted facts." 1A *Collier on Bankruptcy* ¶ 14.40 at 1400–01 (14th ed. 1978).

After carefully reviewing the record this Court finds, inaccurate though Dr. Lind's financial statements may be, Dr. Lind did not intentionally or knowingly deceive his creditors. The question then becomes whether Dr. Lind demonstrated such reckless indifference to the actual facts by failing to examine sources of knowledge available to him in assessing the value of the various assets he listed that the level of intent necessary to deny his discharge can thus be found. After a most careful review of the record and extensive consideration, this ·Court, for the reasons given below, finds that Dr. Lind, though certainly negligent, demonstrated sufficient good faith in his miscalculations as to rebut the allegation of actual intent to deceive by either intentionally or knowingly falsifying his financial statement or by demonstrating reckless disregard for the truth. Consequently Dr. Lind will receive his discharge in bankruptcy.

The size of this case and the complexity of the issues makes the case a difficult one to analyze. Altogether, Mr. Butler's complaint calls into question 15 loans made by 11 different banks and numerous renewals thereof. A total of 15 financial statements. are involved, some of them used more than once·or given to more than one bank and

2. During trial it was suggested by counsel for the bankrupt that in determining what constitutes "engaged in business" a distinction should be made between a passive investment and active involvement in a money–making enterprise. We do not believe that is the distinction Congress intended by adding the term "engaged in business" to § 14(c)(3); rather, we believe the critical distinction to be made is between the ordinary consumer and those who regularly engage in activities requiring significant amounts of borrowed capital, a degree of financial expertise and a "business" risk.

each of which is allegedly false in various particulars. Therefore, rather than deal with all the allegations at once, we will examine each transaction one by one in chronological order to see whether all the requisite elements of § 14(c)(3) are present and proven in each transaction.

■ The first transaction we examine was the delivery by Dr. Lind of a financial statement dated April 16, 1968, to Republic National Bank of Dallas ("Republic Bank"). Thereafter on April 17, 1968, Republic Bank loaned Dr. Lind the sum of $90,000 for the purchase of an airplane. The plane was purchased by Dr. Lind to commute to small towns outside of Houston where he practiced as a radiologist. According to the uncontradicted testimony of W. H. Flemming, Jr., loan officer for Republic Bank at the time, in making the loan the bank relied partially upon Dr. Lind's financial statement and partially upon a purchase money security interest taken in the plane. Dr. Lind testified the financial statement of April 16, 1968 was prepared at his direction.

The financial statement is allegedly erroneous in that it lists as assets two tracts of land in Canada owned by Dr. Lind as follows:

Land:

| | |
|---|---|
| Canada ($1.25 sq. ft. – 47,500) | $59,375.00 |
| Canada ($1.65 sq. ft. – 25,000) | 41,250.00 |

Mr. Butler alleges Dr. Lind grossly overstated the value of the land as he had purchased the first tract two years earlier for a mere $0.27 a square foot and the second tract just a few months prior to the preparation of the financial statement for only $0.26 a square foot.

Dr. Lind testified he based his evaluation of the Canadian land's value upon information he received from others, particularly newspaper clippings and promotional brochures prepared by Can–Am Industrial Development Corp., the company promoting the land sales. According to his testimony, Dr. Lind first learned of the Canadian property sometime in 1964 or 1965 when he began receiving brochures in the mail. He could not remember his first actual contact with the company, but he did remember talking with several of Can–Am's salesmen both in Houston and Canada. The salesmen touted the land as really hot property, stressing that its strategic location along major waterways would make it ideally suited for industrial development. The salesmen's representations were followed by mailings of newspaper articles which indicated the Canadian government was going ahead with plans to develop steel facilities in that area, with other even more ambitious projects due to follow.

As a final device to ensnare the gullible Dr. Lind, the contract contained a "Sale Option" to repurchase the land at a stated price, although the option price was less than the value given for the land by Dr. Lind in his financial statement. The "Option" included an agreement whereby Dr. Lind agreed that he could not and would not oppose a resale of the land by Can–Am if he was offered $1.25/square foot or $1.65/square foot, respectively, on the lots.[3] Dr. Lind testified he consulted no others in his decision to purchase the Canadian land, relying instead upon Can–Am's promotional literature and salesmen, whose representations concerning the land seemed to be verified by newspaper articles and whose good

**3.** As part of their promotional scheme, Can-Am would mail Dr. Lind and other potential customers a very impressive document modeled after a stock certificate and styled "Special Client Land Rights" (see Exhibit "A"). This official looking instrument granted the named holder the right to purchase up to a certain number of units of Canadian land at a given price. To exercise the option the holder was instructed to sign the attached coupon, giving Can–Am an absolute right to repurchase upon the tender of a stated price set considerably above the price the holder was paying for the land. Can–Am required the purchaser to grant such an option as a condition of sale, although they probably never intended to take advantage of it. All these features–the official appearance of the document, the "limit" on the number of lots available to each customer, and the "Sale Option"–were carefully thought out and deliberately instituted. They were intended to impress upon naive buyers the desirability of the Canadian real estate and to dispel any doubts they might have had concerning the good faith of the seller.

faith was supposedly demonstrated by the "Sale Option". This was, in fact, the pattern Dr. Lind would follow in all his Canadian land purchases.

Based upon such evidence this Court cannot find Dr. Lind acted with actual intent to defraud his creditors by either intentionally, knowingly or recklessly valuing the land as he did. Dr. Lind's valuation may not have been reasonable but something more deliberate and more considered is needed to find the intent required to deny a debtor his discharge. Denial of discharge is reserved as punishment for those bankrupts who actually intend to defraud their creditors, whether by intentionally or knowingly falsifying financial records or by recklessly disregarding available sources of information. The filing of bankruptcy and liquidation of all of one's non-exempt assets is itself sufficiently punitive for the careless or negligent debtor.

Turning to the next transaction, Dr. Lind borrowed $6,100 from Fannin Bank of Houston ("Fannin Bank") on August 22, 1968, on the basis of a financial statement dated August 17, 1967. The proceeds of the loan were used to pay off the remaining debt on one of Dr. Lind's earlier Canadian land investments, from which Dr. Lind testified he expected eventually to turn a profit of approximately $50,000.

The financial statement given by Dr. Lind to Fannin Bank listed the following assets:

Canada (Contrecoeur) 48,448 sq. ft. $62,559.90
Canada (Varennes) 37,500 sq. ft. 46,875.00

Mr. Butler alleges Dr. Lind did not solely own the holdings in Varennes or, in the alternative, that he failed to list a corresponding liability to his father–in–law of $5,832.96, the amount contributed by Dr. Lind's father–in–law towards the purchase of the land. Additionally, Mr. Butler again alleges Dr. Lind overvalued the worth of both tracts.

■ Dr. Lind testified his father–in–law gave the money to Mrs. Lind to enable the Linds to make the purchase, retaining no legal or equitable interest in the land. Thus, Dr. Lind arguably had colorable title to all of the Canadian land included on his financial statement. Dr. Lind derived the value of the land from the same sources as before: newspaper articles, promotional literature and representations by the sellers. Once again this Court finds Dr. Lind demonstrated less than the highest standard of care in the preparation of his financial statement but the intent shown is neither fraudulent nor recklessly indifferent.

■ On April 14, 1969, Dr. Lind borrowed $5,000 from the Conroe National Bank on the basis of a financial statement dated that same date. On July 15, 1969, this note was renewed and extended and an additional $5,000 was advanced, bringing the balance to $10,000. Glynn McClellan, the Executive Vice President of Allied Conroe Bank (formerly Conroe National Bank, then Conroe Bank and at the time of trial, Allied Conroe Bank) and the loan officer on the two loans, testified the bank did in fact rely on the financial statement in deciding to grant the loans. The proceeds of the loan were to be used to finance the operations of Par–finders, Inc., an enterprise in which Dr. Lind was an executive officer. Although Dr. Lind testified he did not play an active management role in Par–finders, Inc., he was an officer, attended all board meetings, contributed capital to its formation and expected to make a substantial return on the venture. Thus, we find Par–finders, Inc., to be a "business" in which Dr. Lind was engaged for the purposes of § 14(c)(3).

Mr. Butler charges that Dr. Lind again failed to list the outstanding liability owed to his father–in–law or, in the alternative, that Dr. Lind did not own all of the Canadian land listed, which again he included at a highly inflated value. This time Dr. Lind included as additional assets certain tracts of land in Florida which he had purchased in much the same way as the Canadian land. Mr. Butler alleges and the evidence indicates this land's value was also significantly overstated on the financial statement. Another asset listed by Dr. Lind was 20,000 shares in Chart–A–Course Corp., another of his side–ventures, which he listed

at a cost of $25,000 and fair market value of $50,000. Finally, Dr. Lind failed to include the outstanding liability of $81,675 owed to Republic Bank for the purchase of his airplane.

█ Although these misstatements are significant and material, we still are not convinced they were done with the requisite intent to sustain a § 14(c)(3) complaint. Dr. Lind's financial statement shows not only was he still holding those two tracts in Canada but he was buying even more land in the area. This only reinforces our conclusion Dr. Lind truly believed the Canadian land to be a worthwhile and profitable investment. The Florida land was evaluated in the same manner as the Canadian land and demonstrates that Dr. Lind was at least consistent, if not correct, in his manner of appraising land. Such consistent methodology makes it unlikely that Dr. Lind's actual intent was to defraud his creditors. Finally, although Dr. Lind failed to list his outstanding obligation to Republic Bank, he also failed to list the airplane securing the loan as an asset of his estate. Case law indicates that when a debtor fails to list substantial amounts of assets approximately equal to omitted liabilities, this can be taken as evidence that the debtor was acting negligently and not with the requisite intent to deceive. *In re Ostrer*, 393 F.2d 646 (2nd Cir. 1968).

The next transaction occurred on October 2, 1969 when Dr. Lind obtained a loan in the amount of $5,600 from First National Bank of Conroe, Texas ("First National") after the submission of a financial statement dated April 30, 1969. The purpose of the loan was listed in the loan application as "investing in Canadian Real Estate." Dr. Lind received a renewal of credit on this loan on October 7, 1970, on the basis of a new financial statement prepared and submitted on October 1, 1970. On March 22, 1971, the note, now reduced to $4,357.66, was again renewed and extended after the submission of yet another financial statement, this one dated December 31, 1970. The financial statements of Dr. Lind are

alleged by Mr. Butler to have been false in that Dr. Lind again omitted his outstanding obligation to Republic Bank as well as the $5,000 borrowed from Conroe National Bank on September 17, 1969.

The loan ledger kept by First National on its dealings with Dr. Lind was submitted into evidence; it indicates the bank did rely upon Dr. Lind's financial statements in extending the original loan to Dr. Lind of $5,600. The financial statement supplied by Dr. Lind and dated December 31, 1970, was prepared in the offices of Karl K. Kendall, a certified public accountant. This financial statement was issued without a C.P.A. opinion and contains clear language that the report was prepared without audit. First National was so informed on the face of the report.

█ Dr. Lind's financial statements were becoming increasingly complex due to the increase in the number of his investment ventures, credit activities and accumulated wealth. The omission of liabilities totalling $86,675 for the two loan obligations ($81,675 to Republic Bank and $5,000 to Conroe National Bank) presents a fact question for the Court: did the bank rely upon the false financial statement in loaning $5,600 for the purchase of investment real estate; that is, if First National had known of these additional liabilities would it have refused to loan to Dr. Lind on the basis he presented a poor financial risk? There is no indication in the record that had First National been informed of the $86,675 in additional obligations it would have refused to grant Dr. Lind a $5,600 loan or refused to have renewed that debt as it became due on October 7, 1970, and March 22, 1971.

Although an omission of $86,675 is substantial, it may not meet the test of materiality necessary to sustain a finding under § 14(c)(3) unless it was a contributing, if not primary, cause behind the decision to extend money or credit. See, e. g., 1A *Collier on Bankruptcy* ¶ 14.39 at 1388 (14th ed.

1978). Dr. Lind's omission of the $86,675 liability was balanced by the corresponding omission of the airplane as an asset. In addition, the loan from First National was relatively small and although the bank's ledger introduced into evidence indicates reliance upon the financial statement, it is more likely the bank relied primarily on the character, property, and credit record of Dr. Lind. Alternatively, we still do not find the actual intent to defraud necessary to deny Dr. Lind his discharge. Once again, overvaluation of Dr. Lind's real estate and business holdings seems to be more representative of Dr. Lind's poor business acumen rather than evidence of an intentional, knowing or reckless mental state.

■ We turn next to September 24, 1970, when Dr. Lind borrowed an additional $5,500 from Fannin Bank to be used to purchase additional investment real estate. The loan was made on the basis of a financial statement dated September 17, 1970 and, according to the testimony of David Knapp, Vice Chairman of the Board of Fannin Bank, was relied upon by the bank in making its decision. Mr. Butler reurges his allegation the financial statement overstated the amount of Canadian land held by Dr. Lind, exaggerated its value and failed to include a mortgage of $1,713.00. Once again, Dr. Lind's intent becomes the critical issue. Mr. Knapp testified that although Dr. Lind discussed the intended use of the land with the loan officer, rather than him, he (Mr. Knapp) and Dr. Lind did discuss the nature of some of Dr. Lind's other business ventures. Mr. Knapp further stated he realized in his dealings with Dr. Lind that Dr. Lind did not understand the technicalities of a financial statement; in fact, that is why a typed statement was later requested from Dr. Lind. Dr. Lind, however, always seemed to Mr. Knapp to be very candid in response to any questions about his assets and liabilities. Once again we have the impression of a negligent and perhaps foolish borrower but not one deliberately intending to defraud his creditors.

Early in 1971 Dr. Lind joined with E. J. Butler, Jr., the objecting creditor, and Hollis Walker to form Houston Mini–Mix Concrete Company ("Houston Mini–Mix"). On June 30, 1971, The Western Company of North America loaned Houston Mini–Mix $137,526 enabling the company to make initial purchases of land and equipment. This note was assigned the same day to Reagan State Bank of Houston (now Reagan Commerce Bank) which loaned the company an additional $20,000 to use as working capital. Dr. Lind and Messrs. Butler and Walker were co–guarantors of both loans, and in that capacity each submitted personal financial statements to the bank.

Dr. Lind's financial statement, dated December 31, 1970, was a copy of the statement submitted by Dr. Lind to First National and which had been prepared by Karl K. Kendall, an accountant. In addition to the allegations previously made by Mr. Butler concerning this financial statement, Mr. Butler further alleges this statement to be inaccurate in that it was no longer current or accurate since four outstanding notes payable had been signed by Dr. Lind since its earlier preparation: a $5,500 note payable to Fannin Bank, a $7,100 note payable to Conroe National Bank, a $5,600 note owed to First National and a fourth note for $2,600 (not otherwise material).

■ Again we are confronted with a difficult question of assessing in retrospect the intent of another human being. Dr. Lind's financial statements were becoming progressively more complex but less accurate. We note, however, that the financial statement delivered by Dr. Lind to Reagan State Bank (which was later introduced into evidence) was obviously incomplete as a page was missing. The first page reads "Statement of Assets and Liabilities" and is subheaded "Assets." The second page is entitled "Assets (Continued)" and shows at the bottom a sum entitled "Total assets or equity in the assets" in the amount of $412,-522. The next page, which should be numbered page 3, is missing. Page number 4,

the last page of the financial statement, is a list of "Notes" to the financial statement.

It is apparent from even a cursory reading that this financial statement is incomplete. Nowhere is there a listing of Dr. Lind's liabilities and no financial expertise is required to realize that page number 3 is simply not there. Even if reliance on the information supplied by this statement could be shown, which is doubtful, a person intending to defraud his creditors would not do so by simply omitting a page without adjusting the pagination correspondingly.

The next transaction involves a loan by Southwestern Bank to Houston Mini–Mix of $30,000 on February 10, 1972. Don Vickery President of Southwestern Bank since its inception in 1971 testified that in an attempt to develop the bank's business he approached Hollis Walker about a loan. The company itself did not appear capable of carrying a $30,000 loan, so the bank required guarantees from the three principals, Messrs. Walker and Butler and Dr. Lind. But before approving the loan, Southwestern Bank first requested financial statements from Messrs. Walker and Butler and Dr. Lind, and Dr. Lind submitted a financial statement dated October 11, 1971. Mr. Vickery testified he considered the three financial statements jointly in deciding whether to approve the loan but he could not say whether he would have made the loan without some of the statements. The note was renewed and extended three times, on August 8, 1972, on February 5, 1973, and on August 5, 1973. Finally, on January 30, 1974, the note was sold to Mr. Butler for $27,000 plus $2,500 in accumulated interest.

 Mr. Butler's allegations point to some very sizable omissions in the financial statement of October 11, 1971. Dr. Lind failed to include an outstanding note obligation of $71,098 to Republic Bank for the airplane which had been repossessed by this time. Additionally, he listed his debt to Valley Inn and Country Club as $21,000 when it was actually $25,000. He substantially overvalued his holdings in two of his ventures, Houston Mini–Mix and Impact Exploration and may have overstated the total number of square feet of Canadian real estate he owned.

Once again, however, we are faced with what the bank must have realized was an incomplete financial statement. The first page contains the notation "see other side," which should have been an itemization and listing of various assets and liabilities although, as evidenced by the bank's records, there was no second sheet included. As we concluded in a similar situation with Reagan State Bank, even if Southwestern Bank did rely upon this financial statement as a complete listing of liabilities and assets, which is doubtful, this is the act of a negligent rather than deceitful man.

The next transaction occurred in May of 1972 when Airways Properties, Ltd., ("Airways Properties"), a Texas limited partnership in which Dr. Lind was a limited partner, sought a loan from the Bank of the Southwest National Association, Houston ("Bank of the Southwest"). In connection with the loan John Blocker, the general partner in Airways Properties, delivered a financial package to the Bank of the Southwest on May 18, which contained the financial statement of Dr. Lind as well as the financial statements of the other partners. The proposed use of the funds was to pay off existing liens on 47.89 acres on Swan Road, near Intercontinental Airport in Houston, Texas. Airways Properties submitted its formal loan application on May 31, 1972.

On June 21, 1972, Airways Properties executed a note payable to the Bank of the Southwest in the sum of $750,000. The note shows Dr. Lind as being severally liable to the extent of 18.751%, an amount equal to his partnership interest. Collateral was also given in the form of a first deed of trust lien on the acreage to be paid off, the personal guaranty of Mr. Blocker as to the entire amount of the loan, and the partial

liability of each of the limited partners by way of guaranty. Eventually the note was reduced and Dr. Lind released.

The financial statement submitted by Dr. Lind to the Bank of the Southwest is identical to the one delivered to Southwestern Bank. Mr. Butler alleges it is false in the same particulars and in the same manner. Therefore, for the same reasons we previously concluded this financial statement would not support finding the intent required to deny Dr. Lind's discharge, we again so find with relation to the loan made by Bank of the Southwest.

■ The final transactions raised in the complaint are four loans made to Dr. Lind by First National Bank of Brenham, Texas ("Brenham Bank"). On October 10, 1972, Brenham Bank loaned Dr. Lind $3,000 in reliance on a financial statement dated March 15, 1972. On June 8, 1973, Brenham Bank loaned Dr. Lind an additional $3,000, this time in reliance on three financial statements dated March 15, 1972, June 6, 1972, and February 23, 1973. The record indicates that the proceeds from both of these loans went towards personal living expenses of the Lind family, were not obtained for a "business" and as such will not support an objection to discharge.

■ On May 28, 1974, Brenham Bank loaned Dr. Lind $10,000, this time in reliance on four financial statements, the three mentioned previously plus another dated February 23, 1974. Again the evidence indicates the proceeds were put to personal use: $300 was used to repair damage to Dr. Lind's automobile, while the remainder was used to pay personal income taxes after an audit by the I.R.S. revealed additional taxes to be due and owing.[4] But

irregardless of the proper characterization of the loan, Dr. Lind lacked the requisite intent.

Finally, on February 10, 1975, Brenham Bank made Dr. Lind a final loan of $9,174.20, in reliance on financial statements of March 15, 1972, June 6, 1972, and February 23, 1973. The money loaned to Dr. Lind was used to purchase an automobile for personal use and therefore will not support denial of a discharge under § 14(c)(3).

Although we have examined each transaction seriatim to determine whether a case under § 14(c)(3) has been proved, there is a certain impression that can be garnered in a case this size only after a careful examination of the record as a whole. Trying to understand a case such as this, which involved hundreds of exhibits and numerous days of testimony, by simply scrutinizing individual transactions is like trying to piece together an event from a series of snapshots, which alone represent one solitary moment frozen in time, but which take on a greater and perhaps different import when viewed in relation one to another.

Perhaps this can best be appreciated in a review of the testimony of John Goff, an appraiser from Canada, called by the objecting creditor to testify as to the true value of Dr. Lind's holdings in Canada. Mr. Goff testified he based his evaluation upon a search of his files for other appraisals of the area, a check of surveys made of the territory, a visit to all of the lots owned by Dr. Lind and a check of registries to compare other tracts in the area. After this very careful procedure, Mr. Goff determined, for example, that the land in Contrecoeur purchased by Dr. Lind for 29 cents a square foot in 1967 and for 37.6 cents a

---

4. An I.R.S. audit of Dr. Lind's income tax returns for the years 1969, 1970, and 1971 resulted in the disallowance of many business deductions taken by Dr. Lind. Specifically, the I.R.S. ruled Dr. Lind could not deduct either the depreciation or maintenance on his airplane as it was not an expense of his medical practice, which they considered his only business at that

time. In addition, they disallowed deductions for legal and entertainment expenses, stating they too were unrelated to any business of Dr. Lind. As these disallowances made up the major portion of the resulting tax liability, we find the payment of back income taxes owing to be a personal rather than business expense.

square foot two years later was probably never worth more than 1.0 cent a square foot.

At first blush this would appear to support Mr. Butler's contention Dr. Lind exhibited the requisite intent in giving the land as high a value as he did. Yet one soon realizes that even if Dr. Lind were to have listed the land at the price he paid for it, he still would have valued the land at more than 37 times its fair market value. Additionally, Mr. Goff testified at least five other people bought land in the same area for a higher price than Dr. Lind, some paying as much as 50 cents per square foot. Since he as an expert appraiser could not justify such high prices, Mr. Goff chose to discount such sales. We, however, as the trier of fact do not; such sales are indicative of the reasonableness of Dr. Lind's actions and beliefs. Perhaps the most significant indicator of Dr. Lind's true state of mind is that Dr. Lind continued to buy more Canadian land almost up to the very day he filed bankruptcy, evidently believing the land to be a good, solid investment. Moreover, the values given for those lots on his bankruptcy schedules are similar, if not identical, to the values he assigned to them on his financial statements. Even after he filed bankruptcy Dr. Lind testified he continued to make payments on as many of the Canadian and Florida lots as he could, thinking that by doing so he was preserving assets of the estate. Finally, testimony by the bankers who extended Dr. Lind credit appears very consistent on one point: Dr. Lind appeared to those dealing with him to be very open and honest concerning his finances, even if they did find his attempts at being a "wheeler–dealer" a bit laughable.[5] After reviewing the record as a whole in addition to our transaction by transaction review, it is crystal clear Dr. Lind lacked the requisite intent to have this Court sustain the objection and withhold the discharge.

Counsel for Dr. Lind shall draft and present within five days of the date of this Memorandum Opinion a proposed form of judgment for entry by the Court.

---

5. The description "wheeler–dealer" comes from the testimony of David Knapp, Vice Chairman of the Board of Fannin Bank of Houston. Mr. Knapp also testified he felt Dr. Lind was exceedingly candid in his answers to Mr. Knapp's questions concerning his assets and liabilities and that he never had the feeling Dr. Lind was trying to hide anything about the Canadian property.

This is typical of testimony throughout the trial given by those who personally dealt with Dr. Lind. For instance, Hollis Walker testified he and Dr. Lind often discussed Dr. Lind's financial condition and investments in the years 1968 through 1974. Dr. Lind thought all of his investments were very solid and even tried to involve Mr. Walker in some of them. According to Mr. Walker, Dr. Lind placed a great deal of weight on the promotional packages he received from Can–Am and the representations made by its promoters. Mr. Walker told Dr. Lind he "wouldn't give a dime for the whole thing" and it appeared to him to be a land scheme, though Dr. Lind continued to insist it was a good investment.

386

## SALE OPTION

I hereby grant, for consideration received, a firm SALES OPTION at $1.10 (Can.) (One Dollar and ten cents in Canadian Funds) per square foot (Each unit $2,750.00 Can. Funds) on my entire holdings in Contrecoeur 384-385 to CAN-AM INDUSTRIAL DEVELOPMENT CORP. I undertake to deliver marketable title automatically upon the exercise of this option by said corporation.

........................................................ ........................................................
Usual signature Date

## SPECIAL CLIENT LAND RIGHTS CONTRECOEUR 384-385

Nᵒ 7969

CAN-AM INDUSTRIAL DEVELOPMENT CORP., a body politic and corporate, having its head office in the City of Montreal hereby grants to

.....................................................
DR. JOHN A. LIND

RIGHTS TO PURCHASE up to ............... EIGHT ........ unit(s) of 2,500 sq. ft. each in Contrecoeur 384-385 at $0.50 (U.S.A.), (Fifty cents in U.S.A. Funds) per square foot.

CONDITIONS:

1. Rights not transferable.
2. Rights may be cancelled at any time at the Corporation's discretion.
3. Rights are valid only if attached sale option is granted Can-Am Industrial Development Corp. on terms and conditions set out thereon.

CAN-AM INDUSTRIAL DEVELOPMENT CORP.

Thomas Fisher
.....................................................

Lind #6